# Supreme Court of Florida

_____

No. SC16-223

_____

**MARK JAMES ASAY,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC16-102

_____

**MARK JAMES ASAY,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

_____

No. SC16-628

_____

**MARK JAMES ASAY,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

PER CURIAM.

Mark James Asay, a prisoner under sentence of death for whom a warrant has been signed,[1] appeals from the summary denial of his second successive postconviction motion. Asay has also filed two petitions for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons that follow, we affirm the circuit court's denial of postconviction relief. We also deny the petitions for a writ of habeas corpus.

## FACTS AND PROCEDURAL HISTORY

The facts of this case are set forth in Asay's direct appeal:

> According to testimony of Asay's brother, Robbie, and Robbie's friend, "Bubba" McQuinn, on July 17, 1987, the three met at a local bar where they drank beer and shot pool. They left the bar around 12:00 a.m. and went to a second bar where they stayed until closing at 2:00 a.m. Although Asay drank a number of beers, both Bubba and Robbie testified that Asay did not appear drunk or otherwise impaired.
> After the bar closed, Robbie said he wanted to try to "pick up a girl" he had seen at the bar, so Bubba and Asay drove around the corner in Asay's truck. They returned to discover that Robbie had been unsuccessful with the girl he had seen, so Bubba suggested that they go downtown to find some prostitutes and he would pay for oral sex for them all. Asay and Bubba left in Asay's truck and Robbie left in his. Once downtown, Asay and Bubba soon spotted Robbie who was inside his truck talking to a black man, Robert Lee Booker. Robbie was telling Booker who was standing at the driver's side

---

1. The execution was originally scheduled for March 17, 2016, but was stayed indefinitely by this Court on March 2, 2016.

window of Robbie's truck that he and his friends were looking for prostitutes.

After spotting Booker standing by Robbie's truck, Asay told Bubba to pull up next to the truck. Asay immediately got out of his truck, proceeded to Robbie's truck, and told Robbie "You know you ain't got to take no s--t from these f---ing niggers." Although Robbie told Asay that "everything is cool," Asay began to point his finger in Booker's face and verbally attack him. When Booker told him "Don't put your finger in my face," Asay responded by saying "F--k you, nigger" and pulling his gun from his back pocket, shooting Booker once in the abdomen. Booker grabbed his side and ran. According to the medical examiner, the bullet perforated the intestines and an artery causing internal hemorrhaging. Booker's body was later found under the edge of a nearby house.

Robbie drove away immediately after the shooting. Asay jumped into the back of his truck, as Bubba drove off. When Asay got into the cab of the truck, Bubba asked him why he shot Booker. Asay responded, "Because you got to show a nigger who is boss." When asked if he thought he killed Booker, Asay replied, "No, I just scared the s--t out of him."

Bubba testified that after the shooting, Asay and Bubba continued to look for prostitutes. According to Bubba, he saw "Renee" who he knew would give them oral sex. It appears that at the time neither Bubba nor Asay was aware that "Renee" was actually Robert McDowell, a black man dressed as a woman. According to Bubba, he negotiated a deal for oral sex for them both. Bubba drove the truck into a nearby alley. McDowell followed. Bubba testified that McDowell refused to get into the truck with them both, so Asay left the truck and walked away to act as a lookout while Bubba and McDowell had sex. As McDowell started to get into the truck with Bubba, Asay returned, grabbed McDowell's arm, pulled him from the truck and began shooting him. McDowell was shot six times while he was backing up and attempting to get away. Asay jumped back in his truck and told Bubba to drive away. When asked why he shot McDowell, Asay told Bubba that he did it because "the bitch had beat him out of ten dollars" on a "blow job." McDowell's body was found on the ground in the alley soon after the shots were heard. According to the medical examiner, any of three wounds to the chest cavity would have been fatal.

Asay later told Charlie Moore in the presence of Moore's cousin, Danny, that he shot McDowell because McDowell had cheated him out of ten dollars on a drug deal and that he had told McDowell, "if he ever got him that he would get even." Asay told Moore that he was out looking for "whores," when he came across McDowell. According to Moore's cousin, Danny, Asay also told Moore that his plan was to have Bubba get McDowell in the truck and they "would take her off and screw her and kill her." Moore testified that Asay told him that when Bubba "didn't have [McDowell] in the truck so they could go beat him up," Asay "grabbed [McDowell] by the arm and stuck the gun in his chest and shot him four times, and that when he hit the ground, he finished him off." As a result of tips received from Moore and his cousin after McDowell's murder was featured on a television Crime Watch segment, Asay was arrested and charged by indictment with two counts of first-degree murder.

The state also presented testimony of Thomas Gross, who was Asay's cellmate while he was awaiting trial. Gross testified that when the black prisoners, who were also housed in their cell, were out in the recreation area, Asay told him he was awaiting trial for a couple of murders. According to Gross, Asay then showed him some newspaper articles and told him, "I shot them niggers." While they were discussing the murders, Asay showed Gross his tattoos, which included a swastika, the words "White Pride," and the initials "SWP" which Gross said stand for supreme white power.

Asay v. State (Asay I), 580 So. 2d 610, 610-12 (Fla. 1991).

The jury found Asay guilty of both murders and recommended a death sentence by a vote of nine to three. The trial court followed the recommendation and imposed a sentence of death for each conviction. Id. at 612. The court found two aggravating factors established in connection with both murders: that Asay was under sentence of imprisonment at the time of the murders and had been previously convicted of a capital felony (based on the contemporaneous murder conviction). Id. In addition, the trial court found a third aggravator as to the

McDowell murder only: that the murder was committed in a cold, calculated, premeditated manner (CCP).  Id.  As to both murders, the trial court found Asay's age of twenty-three at the time of the murders to be the only mitigation for his offenses.  Id.

On direct appeal, Asay raised seven issues.[2]  This Court summarily denied the first four claims and also found, after some discussion, that no relief was warranted as to the remaining three claims.  Id. at 612 n.1, 613-14.  On June 21, 1991, this Court denied Asay's motion for rehearing, and the United States Supreme Court denied certiorari on October 7, 1991.  Asay v. Florida, 502 U.S. 895 (1991).

In 1993, Asay filed a motion for postconviction relief[3] pursuant to Florida Rule of Criminal Procedure 3.850 and an amended motion, raising twenty claims.

_____

2. The issues raised on appeal were (1) the trial court erred by allowing racial prejudice to be injected into the trial; (2) the trial court erred in failing to advise Asay of his right to represent himself and to conduct an inquiry when Asay asked to discharge court-appointed counsel; (3) the trial court erred in denying Asay's pro se motion for continuance of the penalty phase of the trial to enable him to secure additional mitigation witnesses; (4) the prosecution improperly diminished the jury's role in sentencing; (5) the trial court judge erred by failing to grant his motion for judgment of acquittal on count I of the indictment charging him with the first-degree premeditated murder of Robert Lee Booker; (6) the trial court erred in finding CCP established as to the McDowell murder; and (7) Asay's death sentence was disproportionate.  Id. at 612 n.1, 613-14.

3. While his postconviction motion was pending, Asay—along with other capital defendants—appealed the Florida Board of Executive Clemency's denial of Asay's public records requests, but this Court held that the obligation of the State

- 5 -

Asay v. State (Asay II), 769 So. 2d 974, 977-78 & n.5 (Fla. 2000).[4] He also filed a

motion to disqualify the trial judge from presiding over the postconviction

proceedings, primarily based on comments the judge made during Asay's 1988

to disclose exculpatory material under Brady v. Maryland, 373 U.S. 83 (1963), does not apply to clemency records.  See Asay v. Fla. Parole Comm'n, 649 So. 2d 859, 860 (Fla. 1994), cert. denied, 516 U.S. 1017 (1995).

4.  These claims were (1) state agencies withheld public records; (2) the trial judge was biased and trial counsel should have sought to have him disqualified; (3) the original trial judge was biased and should have recused himself from presiding over the postconviction proceedings; (4) trial counsel was ineffective during the guilt phase; (5) the jury instructions for the CCP aggravator did not limit the jury's consideration and was not supported by the evidence; (6) the CCP jury instruction was unconstitutional and counsel's failure to object rendered his performance ineffective; (7) Florida's sentencing scheme is unconstitutional; (8) the State's aggravating circumstances argument was overbroad; (9) the trial judge erred in failing to find mitigation present in the record; (10) the penalty phase jury instructions shifted the burden of proof to the defendant; (11) Asay's trial was fundamentally unfair due to the prosecutor's inflammatory comments; (12) Asay did not receive an adequate mental health evaluation as required by Ake v. Oklahoma, 470 U.S. 68 (1985); (13) Asay's counsel was ineffective during the penalty phase; (14) Asay's due process rights were violated and his counsel's performance was rendered ineffective when his motion for a continuance before the penalty phase to secure additional mitigation witnesses was denied; (15) the trial court prevented Asay from presenting mitigation evidence in violation of Lockett v. Ohio, 438 U.S. 586 (1978); (16) Asay's guilt phase counsel was ineffective for not presenting a voluntary intoxication defense; (17) the prosecutor's statement that sympathy could not be considered by the jury was improper; (18) the jury instructions unconstitutionally diluted the jury's sense of sentencing responsibility and counsel was ineffective for not ensuring that the jury received adequate instructions; (19) prosecutorial misconduct rendered Asay's conviction unreliable; and (20) Asay's trial court proceedings, when considered as a whole, were fraught with errors that could not be considered harmless.  Id. at 978 n.5.

trial. Asay II, 769 So. 2d at 978. The trial judge denied the motion to disqualify and, after holding a Huff[5] hearing, summarily denied most of Asay's claims, granting an evidentiary hearing on only the ineffective assistance of trial counsel claims. Id. Following the evidentiary hearing, the trial court denied relief on those claims as well. Id.[6] Asay appealed the denial of relief, raising six issues.[7] We denied the appeal, affirming the trial court's denial of postconviction relief. Id. at

_____

5. Huff v. State, 622 So. 2d 982 (Fla. 1993).

6. During the pendency of Asay's appeal from the denial of his postconviction motion, Asay also joined a mandamus class action suit to stay application of the Florida Death Penalty Reform Act of 2000, of which this Court found certain sections to be unconstitutional. Allen v. Butterworth, 756 So. 2d 52, 67 (Fla. 2000).

7. These issues were (1) judicial bias during the trial and postconviction proceedings denied Asay "a fair and impartial tribunal throughout his proceedings in violation of his due process rights;" (2) the trial court improperly limited the scope of the evidentiary hearing by limiting the testimony of some of Asay's siblings concerning mitigating evidence not presented during the sentencing phase, limiting the scope of Asay's examination of his trial counsel regarding his knowledge of prior inconsistent statements of key witnesses, and refusing to hear the testimony of Thomas Gross recanting his trial testimony; (3) Asay's guilt phase counsel was ineffective for failing to adequately impeach the State's key witnesses, present a voluntary intoxication defense, and rebut the State's arguments that he committed the crime due to his racial animus; (4) penalty phase counsel was ineffective for failing to investigate and present statutory mitigating evidence that Asay was acting under extreme emotional distress and his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, and failing to present nonstatutory mitigating evidence of physical and emotional abuse and poverty during his childhood, alcohol abuse, and his history of "huffing" inhalants; (5) the trial court's summary denial of several claims was improper; and (6) cumulative error. Id. at 978-89.

989. We denied Asay's motion for rehearing on October 26, 2000. Asay then filed a petition for writ of habeas corpus in this Court on October 25, 2001, raising five claims.[8] Asay v. Moore (Asay III), 828 So. 2d 985, 989 n.8 (Fla. 2002). We denied relief on June 13, 2002, and denied Asay's motion for rehearing on October 4, 2002. Id. at 993.

On October 17, 2002, Asay filed his first successive postconviction motion, in which he contended Florida's capital sentencing procedure was unconstitutional pursuant to Ring v. Arizona, 536 U.S. 584 (2002). The circuit court denied the motion on February 23, 2004. Asay appealed, and on December 20, 2004, this Court affirmed the circuit court's order. Asay v. State (Asay IV), 892 So. 2d 1011 (Fla. 2004) (table). Asay filed a petition for writ of certiorari, which the Supreme Court denied on November 2, 2009. McNeil v. Asay, 558 U.S. 1007 (2009).

On February 11, 2005, Asay filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Florida, raising eleven

---

8. The claims raised were (1) appellate counsel was ineffective in failing to argue that Asay was absent during critical stages of the proceedings; (2) Asay's death sentences are unconstitutional because Asay was impermissibly prevented from presenting mitigation, the trial court failed to consider or weigh mitigation, and the prosecutor made impermissible arguments regarding aggravation; (3) appellate counsel was ineffective for failing to raise the trial court's failure to give the requested instruction on CCP; (4) appellate counsel was ineffective for failing to argue that the penalty phase instructions improperly shifted the burden of proof regarding the appropriateness of a life sentence; and (5) Florida's capital sentencing statute and jury instructions are unconstitutional. Id.

claims.[9] <u>Asay v. Sec'y, Fla. Dep't of Corr.</u> (Asay V), No. 3:05-cv-147-J-32PDB, 2014 WL 1463990, *6 (M.D. Fla. April 14, 2014).  On April 14, 2014, the federal district court found that Asay was not entitled to relief and denied the petition.  <u>Id.</u> at *28.  A certificate of appealability was entered as to whether Asay received ineffective assistance during the penalty phase because his counsel failed to investigate, obtain, and present additional mitigating evidence.  <u>Id.</u>  On April 28, 2014, Asay filed an appeal in the Eleventh Circuit Court of Appeals, but on July 8, 2014, the appeal was voluntarily dismissed.

_____

9.  Asay raised the following claims: (1) Asay's Sixth Amendment rights were violated when, during the trial, Asay informed the trial court that he wanted to terminate the services of defense counsel, yet the trial court neither provided substitute counsel nor advised Asay that he had the right to proceed pro se; (2) Asay's counsel was ineffective for delegating the investigation of Asay's case to an investigator and failing to supervise or follow up on that investigator's work product; (3) Asay's counsel was ineffective for failing to meaningfully consult with Asay, failing to obtain and use relevant information about Asay and dropping all defense preparation when he was informed that Asay had confessed to the defense investigator; (4) Asay's counsel was ineffective for failing to meaningfully prepare for trial; (5) Asay's counsel was ineffective for believing that a first degree murder conviction in Asay's case was impossible and therefore failing to prepare for the trial and penalty phase, and laboring under the misconception that there could be no defense if Asay confessed; (6) racial evidence and argument tainted the trial process and denied Asay his right to a fair trial; (7) a State witness, Thomas Gross, admitted after trial that his testimony that Asay was a racist was a lie, that his testimony was coached, and the prosecutor suborned this conduct; (8) Asay's counsel was ineffective for advising Asay not to testify at trial and at the <u>Spencer</u> hearing; (9) Asay's counsel was ineffective for conceding Asay's guilt during closing argument; (10) Florida's capital sentencing scheme is unconstitutional under <u>Ring v. Arizona</u>, 536 U.S. 584 (2002); and (11) defense counsel failed to convey an offer of a plea to second degree murder.  <u>Id.</u> at *1.

On January 8, 2016, Governor Rick Scott signed a death warrant setting Asay's execution for Thursday, March 17, 2016, at 6:00 p.m. Asay filed his second successive postconviction motion on January 27, 2016, asserting four grounds for relief: (1) newly discovered evidence exists that diminishes the reliability of firearms identification evidence presented at trial; (2) Asay's due process and equal protection rights were violated because he did not have state counsel at the time the Governor signed his death warrant and for the previous 10 years; (3) Asay is entitled to relief under Hurst v. Florida, 136 S. Ct. 616 (2016), and that Hurst v. Florida applies retroactively so that the execution should be stayed; and (4) the State violated Brady v. Maryland, 373 U.S. 83 (1963), by suppressing numerous documents Asay recently received. The circuit court summarily denied all four claims and Asay's motion for a stay of execution. Asay now appeals the denial to this Court.

## ANALYSIS

Asay raises four claims in this appeal: (1) Asay's death sentence is unconstitutional under Hurst v. Florida because a judge, rather than a jury, made certain findings to make Asay eligible for a sentence of death; (2) the circuit court erred in denying an evidentiary hearing as to Asay's newly discovered evidence,

- 10 -

Brady,[10] and Strickland[11] claims; (3) Asay was denied due process when the circuit court considered extra record material and conducted an ex parte hearing with the State; and (4) Asay was denied due process, equal protection, and his right to effective collateral representation under Spalding v. Dugger, 526 So. 2d 71 (Fla. 1988), when his death warrant was signed while no registry counsel was in place and had not been in place for over a decade. Asay also filed a habeas petition before this Court, raising the same issue as in claim three above; thus, the habeas petition will be addressed in our discussion of Asay's third postconviction claim. Additionally, Asay filed a petition for a writ of habeas corpus alleging that he is entitled to relief pursuant to chapter 2016-13, Laws of Florida, which requires that at least ten jurors agree with the recommendation of death before a sentence of death can be imposed. We deny Asay's petition based on our decision in Perry v. State, 41 Fla. L. Weekly S449 (Fla. Oct. 14, 2016), that chapter 2016-13, Laws of Florida, is unconstitutional and based on our decision today that Hurst cannot be applied retroactively to Asay.

## I. CONSTITUTIONALITY UNDER HURST v. FLORIDA

---

10. Brady, 373 U.S. 83.

11. Strickland v. Washington, 466 U.S. 668 (1984).

Asay argues that his death sentence is unconstitutional under the United States Supreme Court's decision in Hurst v. Florida. In that case, the Supreme Court reversed our decision in Hurst v. State, 147 So. 3d 435 (Fla. 2014), which denied a Ring claim based on prior Supreme Court precedent that upheld Florida's capital sentencing scheme, and held that Florida's "capital sentencing scheme [is] unconstitutional [because the] Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." Hurst v. Florida, 136 S. Ct. at 619.[12] On remand from the United States Supreme Court, we held "that the Supreme Court's decision in Hurst v. Florida requires that all the critical findings necessary before the trial court may consider imposing a sentence of death must be found unanimously by the jury." Hurst v. State, 202 So. 3d 40, 44 (Fla. 2016). We also held "that in order for the trial court to impose a sentence of death, the jury's recommended sentence of death must be unanimous." Id. Asay contends that he is entitled to retroactive application of Hurst v. Florida, and thus, his death sentences must be vacated. For the reasons explained below, we conclude that Hurst v. Florida should not apply retroactively to cases that were final when Ring was decided.

---

12. Asay raised Ring claims in both his first successive motion for postconviction relief and his subsequent habeas petition before the U.S. District Court for the Middle District of Florida. He did not raise a Sixth Amendment challenge to his death sentence at any time prior to Ring.

## A. <u>Ring</u> and <u>Hurst v. State</u>

In <u>Ring</u>, the United States Supreme Court held the Arizona capital sentencing statute unconstitutional "to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." <u>Id.</u> at 609.  The Court endorsed the holding of <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), and overruled in relevant part <u>Walton v. Arizona</u>, 497 U.S. 639 (1990), explaining that "[c]apital defendants, no less than non-capital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." <u>Ring</u>, 536 U.S. at 590.  In reaching this result, the Supreme Court discussed both Arizona law and Florida law, noting that Arizona law did not permit a defendant to be sentenced to death until the judge presided over a separate sentencing hearing and made factual findings on its own that aggravators existed, while under Florida law, "the jury recommends a sentence but makes no explicit findings on aggravating circumstances." <u>Id.</u> at 598.

When discussing its prior holdings pertaining to Florida and Arizona, the Supreme Court cited both <u>Walton</u>, 497 U.S. at 649, and <u>Hildwin v. Florida</u>, 490 U.S. 638, 640-41 (1989), for its prior holding that "the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury." <u>Ring</u>, 536 U.S. at 598.  However, despite recognizing

- 13 -

that the Arizona court "was bound by the Supremacy Clause to apply Walton," the Supreme Court overruled only Walton—not Hildwin. Ring, 536 U.S. at 596.

In determining that Arizona's capital sentencing scheme violated the Sixth Amendment, the Supreme Court rejected Arizona's claim that because the capital sentencing statute prescribed "death or life imprisonment" for first-degree murder, Ring had been sentenced to no more than the maximum punishment authorized by the jury verdict. Id. at 604. The Court instead found that "the required finding of an aggravated circumstance exposed Ring to a greater punishment than that authorized by the guilty verdict." Id. at 586 (citations and brackets omitted). The Supreme Court noted that if this argument prevailed, "Apprendi would be reduced to a 'meaningless and formalistic' rule of statutory drafting." Id. In addition, the Court rejected a distinction between elements of an offense and sentencing factors. Id. In a dissent by Justice O'Connor, in which Chief Justice Rehnquist joined, Justice O'Connor stated her concern that prisoners in states like Florida would seize on the Ring holding to challenge their sentences, despite the fact that those sentences involve a hybrid sentencing scheme. Id. at 621 (O'Connor, J., dissenting).

Once Ring was issued, this Court was required to determine its application to Florida since, at the time, the Supreme Court had initially stayed the execution of two Florida inmates and then lifted the stays after Ring was decided without

mentioning that case. In a sharply divided opinion issued in <u>Bottoson v. Moore</u>, 833 So. 2d 693 (Fla. 2002), this Court declined to apply the principles espoused in <u>Ring</u> to an ongoing death warrant—in which the conviction and sentence were affirmed in 1983.[13] <u>Bottoson</u>, 833 So. 2d at 694, <u>abrogated by</u> <u>Hurst v. Florida</u>, 136 S. Ct. 616. In reaching that result, the plurality decision relied on the fact that in <u>Hildwin</u>—a decision that was mentioned in <u>Ring</u> but not overruled like <u>Walton</u>—the United States Supreme Court expressly held the Florida death penalty scheme did not violate the Sixth Amendment. <u>See</u> <u>Bottoson</u>, 833 So. 2d at 695, n.4. Further, this Court emphasized that the Supreme Court summarily denied Bottoson's petition for certiorari and lifted his stay. <u>Id.</u> By doing so, the Supreme Court did not provide this Court with an opportunity to reconsider our earlier decision in <u>Bottoson</u> in light of <u>Ring</u>, thus leading to this Court's conclusion that <u>Ring</u> did not impact Florida because Florida has a hybrid capital sentencing scheme, in contrast with Arizona's law in which the jury is not involved. However, this Court was deeply divided regarding the impact of <u>Ring</u> in Florida; each Justice wrote a special opinion setting forth his or her reasoning. The Court reached a similar decision in <u>King v. Moore</u>, 831 So. 2d 143 (Fla. 2002).

---

13. <u>See</u> <u>Bottoson v. State</u>, 443 So. 2d 962, 963 (Fla. 1983) (affirming conviction and sentence).

- 15 -

On direct appeal in Hurst v. State, this Court addressed a resentencing in which a jury recommended death but made no explicit findings as to whether the defendant qualified for a death sentence, and then the judge, in a separate hearing, followed the recommendation, concluding that sufficient aggravators were present and were not outweighed by the mitigation. Hurst v. State, 147 So. 3d at 452. The defendant raised a Ring claim, asserting that "capital defendants are entitled to a jury determination of any fact on which the legislature conditions an increase in the maximum punishment." Id. at 445. In a 4-3 decision, this Court rejected Hurst's argument, relying on Bottoson and King and emphasizing that in Hildwin, the United States Supreme Court stated, "[T]he Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury." Hurst v. State, 147 So. 3d at 446 (quoting Hildwin, 490 U.S. at 640-41). Justice Pariente, joined by Justices Labarga and Perry, dissented in part as to the Ring analysis and stated that "Florida's death penalty statute, as applied in circumstances like those presented in this case where there is no unanimous jury finding as to any of the aggravating circumstances, is unconstitutional." Id. at 449-50 (Pariente, J., concurring in part and dissenting in part).

The United States Supreme Court granted certiorari and reversed this Court's decision, holding that Florida's sentencing scheme in death penalty cases is unconstitutional because "[t]he Sixth Amendment requires a jury, not a judge, to

find each fact necessary to impose a sentence of death. A jury's mere recommendation is not enough." Hurst v. Florida, 136 S. Ct. at 619. The Supreme Court described Florida's capital procedure:

> First-degree murder is a capital felony in Florida. See Fla. Stat. § 782.04(1)(a) (2010). Under state law, the maximum sentence a capital felon may receive on the basis of the conviction alone is life imprisonment. § 775.082(1). "A person who has been convicted of a capital felony shall be punished by death" only if an additional sentencing proceeding "results in findings by the court that such person shall be punished by death." Ibid. "[O]therwise such person shall be punished by life imprisonment and shall be ineligible for parole." Ibid.
> The additional sentencing proceeding Florida employs is a "hybrid" proceeding "in which [a] jury renders an advisory verdict but the judge makes the ultimate sentencing determinations." Ring v. Arizona, 536 U.S. 584, 608, n.6 (2002). First, the sentencing judge conducts an evidentiary hearing before a jury. Fla. Stat. § 921.141(1) (2010). Next, the jury renders an "advisory sentence" of life or death without specifying the factual basis of its recommendation. § 921.141(2). "Notwithstanding the recommendation of a majority of the jury, the court, after weighing the aggravating and mitigating circumstances, shall enter a sentence of life imprisonment or death." § 921.141(3). If the court imposes death, it must "set forth in writing its findings upon which the sentence of death is based." Ibid. Although the judge must give the jury recommendation "great weight," Tedder v. State, 322 So. 2d 908, 910 (Fla. 1975) (per curiam), the sentencing order must "reflect the trial judge's independent judgment about the existence of aggravating and mitigating factors," Blackwelder v. State, 851 So. 2d 650, 653 (Fla. 2003) (per curiam ).

Id. at 620.

The Supreme Court recognized that this Court rejected the defendant's Sixth Amendment argument on the basis that Ring was inapplicable in light of the

- 17 -

Supreme Court's "repeated support of Florida's capital sentencing scheme in pre-Ring cases," including Hildwin, which held that the Sixth Amendment "does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury." Id. at 620-21 (quoting Hildwin, 490 U.S. at 640-641). However, the Supreme Court also noted that since its decision in Apprendi, it has consistently held that "any fact that 'expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict' is an 'element' that must be submitted to a jury." Id. at 621 (quoting Apprendi, 530 U.S. at 494). The Court then held that the analysis in Ring applied equally to Florida's statutory scheme:

> The analysis the Ring Court applied to Arizona's sentencing scheme applies equally to Florida's. Like Arizona at the time of Ring, Florida does not require the jury to make the critical findings necessary to impose the death penalty. Rather, Florida requires a judge to find these facts. Fla. Stat. § 921.141(3). Although Florida incorporates an advisory jury verdict that Arizona lacked, we have previously made clear that this distinction is immaterial: "It is true that in Florida the jury recommends a sentence, but it does not make specific factual findings with regard to the existence of mitigating or aggravating circumstances and its recommendation is not binding on the trial judge. A Florida trial court no more has the assistance of a jury's findings of fact with respect to sentencing issues than does a trial judge in Arizona." Walton v. Arizona, 497 U.S. 639, 648 (1990); accord, State v. Steele, 921 So. 2d 538, 546 (Fla. 2005) ("[T]he trial court alone must make detailed findings about the existence and weight of aggravating circumstances; it has no jury findings on which to rely").
> As with Timothy Ring, the maximum punishment Timothy Hurst could have received without any judge-made findings was life in prison without parole. As with Ring, a judge increased Hurst's

authorized punishment based on her own factfinding.  In light of <u>Ring</u>, we hold that Hurst's sentence violates the Sixth Amendment.

<u>Id.</u> at 621-22 (emphasis added).

In explicitly rejecting the argument that the jury's death recommendation "necessarily included a finding of an aggravating circumstance," the Supreme Court turned to Florida's sentencing statute, which "does not make a defendant <u>eligible for death</u> until 'findings <u>by the court</u> that such person shall be punished by death' " and requires that "the trial court <u>alone</u> must find 'the <u>facts</u> . . . [t]hat sufficient aggravating circumstances exist' and '[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances.' " <u>Id.</u> at 621-22 (quoting § 921.141(3), Fla. Stat.) (last emphasis added).  Accordingly, the High Court concluded that in Florida, the advisory recommendation by the jury could not be considered the necessary factual finding that <u>Ring</u> requires.  <u>Id.</u>

The Supreme Court further rejected the claim that stare decisis required Florida's capital sentencing scheme to be upheld.  <u>Id.</u> at 623.  Instead, the Court expressly overruled its prior decisions in <u>Hildwin</u> and <u>Spaziano v. Florida</u>, 468 U.S. 447 (1984), as irreconcilable with <u>Apprendi</u>.  The Court did not address whether Florida's sentencing scheme violated the Eighth Amendment.  The Supreme Court also left to this Court the decision of whether and how to apply <u>Hurst v. Florida</u> and whether any <u>Hurst v. Florida</u> error can be harmless.

## B. Meaning of <u>Hurst v. Florida</u>

Asay and the State fundamentally disagree as to the meaning of <u>Hurst v. Florida</u>. The State asserts that only one aggravator must be found by the jury to satisfy <u>Hurst v. Florida</u>, pointing to language in the <u>Hurst v. Florida</u> opinion that supports this interpretation. Asay, on the other hand, asserts that under section 921.141, Florida Statutes the jury must find <u>both</u> that "sufficient aggravators" exist and that there are insufficient mitigating factors because those are the "facts" required to be found before the death penalty can be imposed. As we have explained fully in <u>Hurst</u>, "<u>Hurst v. Florida</u> requires that all the critical findings necessary before the trial court may consider imposing a sentence of death must be found unanimously by the jury." <u>Hurst</u>, 202 So. 3d at 44. Also, "based on Florida's requirement for unanimity in jury verdicts, and under the Eighth Amendment to the United States Constitution, . . . the jury's recommended sentence of death must be unanimous." <u>Id.</u> Accordingly, we next consider whether <u>Hurst v. Florida</u> applies retroactively to Asay.

## C. Retroactivity

Now that the United States Supreme Court has overruled <u>Hildwin</u> and held that Florida's hybrid sentencing scheme violates the Sixth Amendment right to trial by jury, Asay contends that this Court should apply <u>Hurst v. Florida</u> retroactively. In order to answer this question, we must first look to our decision in <u>Johnson v.</u>

State, 904 So. 2d 400, 409 (Fla. 2005), which held that Ring does not apply retroactively. While that decision would seem to answer the question presented here—since Hurst v. Florida derives from Ring—a retroactivity analysis hinges on an accurate understanding of the underlying decision, and in Johnson, this Court did not fully apply the holding of Ring because we were attempting to reconcile the United States Supreme Court's holdings in Ring and Hildwin.

In addressing whether Ring should apply retroactively, this Court announced in Johnson that despite the federal courts' use of Teague v. Lane, 489 U.S. 288 (1989), to determine retroactivity, this Court would "continue to apply our longstanding Witt[14] analysis, which provides more expansive retroactivity standards than those adopted in Teague." Johnson, 904 So. 2d at 409 (emphasis added).[15] However, our application of Witt v. State, 387 So. 2d 922 (Fla. 1980), was significantly impacted by our attempt to reconcile the holding of Ring with the holding of Hildwin. First, we relied on the Supreme Court's Teague analysis in Schriro v. Summerlin, 542 U.S. 348 (2004), finding that the decision in Ring "was

_____

14. Witt v. State, 387 So. 2d 922 (Fla. 1980).

15. The Supreme Court has also acknowledged that a Teague analysis is very narrow, particularly if a court considers the new rule to be procedural. See Montgomery v. Louisiana, 136 S. Ct. 718, 728 (2016) ("Teague requires the retroactive application of new substantive and watershed procedural rules in federal habeas proceedings."); Schriro v. Summerlin, 542 U.S. 348, 352 (2004).

not a substantive change to the law, but rather a 'prototypical procedural rule[],' in that it regulates the manner in which culpability is determined but does not alter the range of conduct or class of persons that the law punishes. Johnson, 904 So. 2d at 409 (quoting Summerlin, 542 U.S. at 353). However, such analysis derives from the much narrower Teague test, which utilizes completely different factors from Florida's Witt test.

In addition, our retroactivity analysis in Johnson hinged upon our understanding of Ring's application to Florida's capital sentencing scheme at that time. Thus, we did not treat the aggravators, the sufficiency of the aggravating circumstances, or the weighing of the aggravating circumstances against the mitigating circumstances as elements of the crime that needed to be found by a jury to the same extent as other elements of the crime. Specifically, because we were still bound by Hildwin, we did not properly analyze the purpose of the new rule in Ring, which was to protect the fundamental right to a jury in determining each element of an offense. With the issuance of Hurst v. Florida, in which the United States Supreme Court overruled its decision in Hildwin, we conclude that this Court must now reconsider its prior decision in Johnson. Accordingly, we now turn to a retroactivity analysis in this case.

Applying cases retroactively is a "thorny" issue, "requiring that [this Court] resolve a conflict between two important goals of the criminal justice system

ensuring finality of decisions on the one hand, and ensuring fairness and uniformity in individual cases on the other within the context of post-conviction relief from a sentence of death." Witt, 387 So. 2d at 924-25. On the one hand, this Court has recognized the vast importance of finality in the justice system:

> It has long been recognized that, for several reasons, litigation must, at some point, come to an end. In terms of the availability of judicial resources, cases must eventually become final simply to allow effective appellate review of other cases. There is no evidence that subsequent collateral review is generally better than contemporaneous appellate review for ensuring that a conviction or sentence is just. Moreover, an absence of finality casts a cloud of tentativeness over the criminal justice system, benefiting neither the person convicted nor society as a whole.

Id. at 925. Yet, on the other hand, ensuring fairness and uniformity is an underpinning of the same justice system:

> [S]ociety recognizes that a sweeping change of law can so drastically alter the substantive or procedural underpinnings of a final conviction and sentence that the machinery of post-conviction relief is necessary to avoid individual instances of obvious injustice. Considerations of fairness and uniformity make it very difficult to justify depriving a person of his liberty or his life, under process no longer considered acceptable and no longer applied to indistinguishable cases.

Id. In any retroactivity analysis, this Court must determine where finality yields to fairness based on a change in the law. To apply a newly announced rule of law to a case that is already final at the time of the announcement, this Court must conduct a retroactivity analysis pursuant to the dictates of Witt.

- 23 -

Under <u>Witt</u>, a change in the law does not apply retroactively "unless the change: (a) emanates from this Court or the United States Supreme Court, (b) is constitutional in nature, and (c) constitutes a development of fundamental significance." <u>Id.</u> at 931. To be a "development of fundamental significance," the change in law must "place beyond the authority of the state the power to regulate certain conduct or impose certain penalties," or, alternatively, be "of sufficient magnitude to necessitate retroactive application as ascertained by the three-fold test of <u>Stovall</u>[16] and <u>Linkletter</u>."[17] <u>Id.</u> at 929. The <u>Stovall</u>/<u>Linkletter</u> test requires courts to analyze three factors: (a) the purpose to be served by the rule, (b) the extent of reliance on the prior rule, and (c) the effect that retroactive application of the new rule would have on the administration of justice. <u>Id.</u> at 926; <u>Johnson</u>, 904 So. 2d at 408.

As with <u>Ring</u>, it is not in dispute that <u>Hurst v. Florida</u> satisfies the first two prongs of <u>Witt</u> because it emanates from the Supreme Court and is constitutional in nature. However, the third prong turns entirely on whether the decision represents a "development of fundamental significance" or is "of sufficient magnitude."

---

16. <u>Stovall v. Denno</u>, 388 U.S. 293, 297 (1967).

17. <u>Linkletter v. Walker</u>, 381 U.S. 618, 636 (1965).

Again, like Ring, this last prong turns on the Stovall/Linkletter test, which we address below.

## 1. Purpose of the New Rule

The first factor under the Stovall/Linkletter test is the purpose to be served by the new rule. Witt, 387 So. 2d at 926. In this case, the purpose of the new rule is to ensure that a criminal defendant's right to a jury is not eroded and encroached upon by sentencing schemes that permit a higher penalty to be imposed based on findings of fact that were not made by the jury. See Hurst, No. SC12-1947, slip op. at 21-23 (discussing the necessity of a unanimous jury decision regarding the finding of aggravators and whether those aggravators outweigh any mitigation).

The importance of the right to a jury trial has been recognized since this country's inception and is the only right to appear in both the body of the Constitution and the Bill of Rights. Art. III, § 2, U.S. Const.; U.S. Const. amend. VI. In fact, in the very line of cases at issue here, the United States Supreme Court has recognized that the right to a jury's determination of all the elements of an offense is of utmost importance, thereby changing its previous position that "sentencing considerations" were an exception to the rule. See Apprendi, 530 U.S. at 476 ("At stake in this case are constitutional protections of surpassing importance."); see also Ring, 536 U.S. at 609 ("Because . . . aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth

- 25 -

Amendment requires that they be found by a jury." (citation omitted) (emphasis added)).

Likewise, in Florida, this Court has "always considered the right to jury trial an indispensable component of our system of justice." Blair v. State, 698 So. 2d 1210, 1213 (Fla. 1997). In fact, Florida's first Constitution declared, "That the great and essential principles of liberty and free government, may be recognized and established, we declare: . . . That the right of trial by jury, shall for ever remain inviolate." Art. I, § 6, Fla. Const. (1838). This Court has consistently recognized the importance of a defendant's right to a jury trial, calling it "indisputably one of the most basic rights guaranteed by our constitution." State v. Griffith, 561 So. 2d 528, 530 (Fla. 1990).

The underpinnings of Hurst v. Florida, requiring that the jury make all the factual findings necessary to impose a death sentence, are based on the critical right to a jury trial: one of the guarantees set forth in the Bill of Rights since our country's—and this State's—inception. The right to a jury trial not only ensures a defendant's guilt is accurately determined, but also that any decision on the matter is made by a group of the defendant's peers—as opposed to a member of the government. Our citizens place their trust in our criminal justice system in large part because the citizens themselves are the crucial element in determining a defendant's guilt or innocence.

Further, as is apparent, the ultimate decision of whether a defendant lives or dies rests on these factual findings, only strengthening the purpose of the new rule. Both this Court and the Supreme Court have recognized that "death is different." See, e.g., Yacob v. State, 136 So. 3d 539, 546 (Fla. 2014) (quoting Fitzpatrick v. State, 527 So. 2d 809, 811 (Fla. 1988)); Ring, 536 U.S. at 605. Thus, in death cases, this Court has taken care to ensure all necessary constitutional protections are in place before one forfeits his or her life, and the purpose of the new rule weighs in favor of applying Hurst v. Florida retroactively to Asay.

## 2. Reliance on the Old Rule

The next and most important factor is the extent of reliance on the old rule—in this case, the principle that the judge could make the factual determinations necessary to impose death and that a jury determination of those facts was not required. Florida was the first state to revise its death penalty statute in 1972 after the death penalty was declared unconstitutional in all states as violative of the Eighth Amendment in Furman v. Georgia, 408 U.S. 238 (1972). In keeping with the holding of Furman, which was to substantially narrow the class of murders eligible for the sentence of death, Florida's statute included specified aggravators, which were intended to be specific and unambiguous. A challenge immediately arose, and in a 5-2 decision, this Court upheld the death penalty in State v. Dixon, 283 So. 2d 1 (Fla. 1973). There, the Court focused on whether the new statute

adequately curbed the discretion of judges to impose the ultimate punishment to

avoid violating the Eighth Amendment:

> Death is a unique punishment in its finality and in its total rejection of the possibility of rehabilitation.  It is proper, therefore, that the Legislature has chosen to reserve its application to only the most aggravated and unmitigated of most serious crimes.  In so doing, the Legislature has also recognized the inability of man to predict the myriad tortuous paths which criminality can choose to follow.  If such a prediction could be made, the Legislature could have merely programmed a judicial computer with all of the possible aggravating factors and all of the possible mitigating factors included—with ranges of possible impact of each—and provided for the imposition of death under certain circumstances, and for the imposition of a life sentence under other circumstances.  However, such a computer could never be fully programmed for every possible situation, and computer justice is, therefore, an impossibility.  The Legislature has, instead, provided a system whereby the possible aggravating and mitigating circumstances are defined, but where the weighing process is left to the carefully scrutinized judgment of jurors and judges.

Id. at 7.  In discussing the role of the jury as one of the five steps in Florida's death

penalty scheme, this Court in Dixon elaborated:

> The second step of the sentencing procedure is that the jury— the trial jury if there was one, or a specially called jury if jury trial was waived—must hear the new evidence presented at the post-conviction hearing and make a recommendation as to penalty, that is, life or death.  With the issue of guilt or innocence disposed of, the jury can then view the question of penalty as a separate and distinct issue.  The fact that the defendant has committed the crime no longer determines automatically that he must die in the absence of a mercy recommendation.  They must consider from the facts presented to them—facts in addition to those necessary to prove the commission of the crime—whether the crime was accompanied by aggravating circumstances sufficient to require death, or whether there were mitigating circumstances which require a lesser penalty.

- 28 -

Id. at 8. Ultimately, the Court upheld Florida's revised capital sentencing statute as constitutional under the Eighth Amendment.

Rather than viewing aggravators as part of the jury's ultimate determination—such as guilt or innocence, which has always been recognized as within the Sixth Amendment right to trial by jury—states treated aggravators as "sentencing factors" and gave the trial judge, with mandatory review by this Court, the ultimate responsibility for finding them. Our sentencing scheme was challenged and upheld by the United States Supreme Court in Hildwin and Walton, where the Supreme Court specifically rejected broad challenges to Florida's and Arizona's sentencing schemes under the Sixth Amendment, and later in Spaziano, where Florida's statute was also upheld against an Eighth Amendment challenge.

Over time, however, various legislatures extended a trial court's authority to make factual determinations in a way that exposed defendants to higher sentences than authorized by a jury's verdict alone, amending criminal statutes in noncapital cases to include "sentencing factors" where the judge found specified facts after the jury's verdict to increase the sentence. See, e.g., Apprendi, 530 U.S. at 476-87 (setting forth the history of legislatures providing trial judges with the authority to make factual findings on matters classified as "sentencing factors"). Thus, in cases where a defendant was brandishing a firearm or committed a crime based on hate, a higher sentence was authorized if the trial judge made certain factual findings. In

Apprendi, the United States Supreme Court held for the first time that a state law was unconstitutional when it permitted the judge—rather than the jury—to make a factual finding as to whether a defendant committed a crime to intimidate the victim based on a particular characteristic the victim possessed and thus impose a greater punishment based on this finding. Id. at 496. However, in reaching this decision, the Supreme Court distinguished capital cases from its holding in Apprendi to the extent that capital cases permitted a judge to find specific aggravating factors before imposing a sentence of death. Id. at 497.

This Court relied upon that precedent, which had categorically rejected Sixth Amendment challenges to the capital sentencing statute and held Florida's capital sentencing scheme to be constitutional. See Hildwin, 490 U.S. 638. Further, while the reasoning of Apprendi appeared to challenge the underlying prior reasoning of Walton and similar cases, the United States Supreme Court expressly excluded death penalty cases from its holding. Apprendi, 530 U.S. at 496 ("[T]his Court has previously considered and rejected the argument that the principles guiding our decision today render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death."). Based on the whole of the jurisprudence at the time Asay's conviction and sentence were affirmed on

- 30 -

direct appeal, this Court and the State of Florida had every reason to believe that its capital sentencing scheme was constitutionally sound.[18]

This prong does not only focus on whether this Court's reliance on the old rule was in good faith, but also requires us to consider the breadth of our prior reliance. In this context, this Court's reliance on the old rule has spanned decades' worth of capital cases, with 386 inmates currently residing on death row and 92 executions carried out since 1976. See Fla. Dep't of Corrections, Death Row Fact Sheet, available at http://www.dc.state.fl.us/oth/deathrow/index.html (under "Death Row" heading, click on link to "Death Row List" and "Execution List") (last visited October 13, 2016). As this Court stated in Johnson, "That Florida has reasonably relied on its longstanding capital sentencing scheme is an important factor weighing against the retroactive application of Ring." Johnson, 904 So. 2d at 411; see also Williams v. State, 421 So. 2d 512, 515 (Fla. 1982) ("It was

18. In fact, our reliance on the old rule was well-placed up until the decision in Ring, after which point this Court struggled with how Ring should be properly interpreted in Florida, since the Supreme Court deliberately did not make broad pronouncements and chose to overrule only its decision in Walton. This meant that the Supreme Court left intact its prior pronouncements in Hildwin and Spaziano, which had previously held Florida's statutory scheme to be constitutional. Thus, this Court was faced with competing holdings in Hildwin and Ring—a difference that could be explained by the difference in the two state statutes at issue. Based on the uncertainty, however, we urged the Legislature to amend the capital sentencing scheme in order to ensure any possible constitutional infirmities could be avoided. In other words, only after the issuance of Ring was the law on this point no longer clear.

reasonable . . . to rely upon [the old] law. That significant reliance has been placed on the old rule is an important factor supporting prospective application of the new rule.").

Thus, when considering this prong in the context of Asay's sentence, which was final before <u>Ring</u>, we determine that this Court, the State of Florida in prosecuting these crimes, and the families of the victims, had extensively relied on the constitutionality of Florida's death penalty scheme based on the decisions of the United States Supreme Court. This factor weighs heavily against retroactive application of <u>Hurst v. Florida</u> to this pre-<u>Ring</u> case.

### 3. Effect on the Administration of Justice

The last prong of the <u>Stovall</u>/<u>Linkletter</u> test analyzes the effect of applying the new rule on the administration of justice. As the Court stated in <u>Ferguson v. State</u>, 789 So. 2d 306 (Fla. 2001), "This final consideration in the retroactivity equation requires a balancing of the justice system's goals of fairness and finality." <u>Id.</u> at 312. As a part of this analysis, this Court must review the risk of whether applying the new rule retroactively could "destroy the stability of the law, render punishments uncertain and therefore ineffectual, and burden the judicial machinery of our state, fiscally and intellectually, beyond any tolerable limit." <u>Id.</u> (quoting <u>Witt</u>, 387 So. 2d at 929-30).

As this Court recognized in Johnson, this factor weighs heavily against

retroactive application.  At the time Johnson was decided, approximately 367

defendants were on Florida's Death Row, and at the present time, there are 386

defendants on death row.  See Fla. Dep't of Corrections, Death Row Fact Sheet,

available at http://www.dc.state.fl.us/oth/deathrow/index.html (under "Death Row"

heading, click on link to "Death Row List") (last visited October 13, 2016).  Of

those defendants currently on death row, approximately 45 percent have sentences

that were final before the Supreme Court issued Ring.  In addition to the fact that

there are a substantial number of death sentences the finality of which would be

upended, nearly half of those defendants committed their crimes and had their

sentences upheld decades ago.  As this Court explained in Johnson:

> The retroactive application of Ring in Florida would require
> reconsideration of hundreds of cases to determine whether a new
> penalty phase is warranted.  This reconsideration alone would be a
> major undertaking.  Even though we have rejected numerous Ring
> claims in postconviction proceedings on grounds other than non-
> retroactivity, such as existence of a prior violent felony conviction
> aggravator or a unanimous death recommendation, the United States
> Supreme Court has not addressed whether these distinctions comport
> with the Sixth Amendment.  One member of this Court, relying on the
> decision of the Arizona Supreme Court on remand in Ring, has
> dissented from our conclusion that a single Ring-exempt aggravator
> permits reliance on other aggravators found solely by the trial judge.
> See Duest v. State, 855 So. 2d 33, 56 (Fla. 2003) (Anstead, C.J.,
> concurring in part and dissenting in part).  Thus, if Ring were made
> retroactive its impact on Florida's death-row population would remain
> unclear.
>
> Resentencing hearings necessitated by retroactive application of
> Ring would be problematic.  For prosecutors and defense attorneys to

reassemble witnesses and evidence literally decades after an earlier conviction would be extremely difficult. We fear that any new penalty phase proceedings would actually be less complete and therefore less (not more) accurate than the proceedings they would replace. As we explained in State v. Glenn, 558 So. 2d 4 (Fla. 1990), where we declined to apply retroactively the double jeopardy ruling of Carawan v. State, 515 So. 2d 161 (Fla. 1987):

> Granting collateral relief . . . would have a strong impact upon the administration of justice. Courts would be forced to reexamine previously final and fully adjudicated cases. Moreover, courts would be faced in many cases with the problem of making difficult and time-consuming factual determinations based on stale records. We believe that a court's time and energy would be better spent in handling its current caseload. . . .

Glenn, 558 So. 2d at 8; see also Reed v. State, 837 So. 2d 366, 370 (Fla. 2002) (refusing to apply a new rule retroactively to child abuse cases because it "would require courts to revisit numerous final convictions and to extensively review stale records"); Williams, 421 So. 2d at 515 (refusing to apply a new rule retroactively because it would entail hearings with "evidence possibly long since destroyed, misplaced, or deteriorated" and witnesses who "may not be available or [whose] memory might be dimmed"); [State v. Towery, 64 P.3d 828, 835 (Ariz. 2003)] (recognizing that "[c]onducting new sentencing hearings [for Arizona's 90 death row prisoners], many requiring witnesses no longer available, would impose a substantial and unjustified burden on Arizona's administration of justice").

904 So. 2d at 411-12. Thus, we concluded that "[t]o apply Ring retroactively in Florida would . . . 'consume immense judicial resources without any corresponding benefit to the accuracy or reliability of penalty phase proceedings.'" Id. at 412.

Although we recognize that Johnson's analysis of the first prong of Witt was impacted by an incorrect understanding of the Sixth Amendment claim, the

- 34 -

analysis as to the impact on the administration of justice holds the same force. Penalty phase resentencing is a time-intensive proceeding that requires significant preparation and discovery, death-qualifying a jury, and generally, a multi-day trial. Further, penalty phase proceedings require juries to have a full understanding of the crime committed, so the State would be required to present evidence from the guilt phase as well. While some of the prior witnesses' statements could be admitted based on the transcripts from the prior sentencing, the jury's ability to weigh the strength of those witnesses would clearly be impacted. Finally, there is an important consideration regarding the impact a new sentencing proceeding would have on the victims' families and their need for finality. Thus, we conclude that this factor also weighs heavily against applying Hurst v. Florida retroactively to Asay.

### 4. Conclusion of Retroactivity Analysis

After weighing all three of the above factors, we conclude that Hurst should not be applied retroactively to Asay's case, in which the death sentence became final before the issuance of Ring. We limit our holding to this context because the balance of factors may change significantly for cases decided after the United States Supreme Court decided Ring. When considering the three factors of the Stovall/Linkletter test together, we conclude that they weigh against applying

Hurst retroactively to all death case litigation in Florida. Accordingly, we deny Asay relief.

## II. DENIAL OF EVIDENTIARY HEARING ON ASAY'S CLAIMS

Asay argues that the circuit court erred in summarily denying his newly discovered evidence and Brady/Strickland claims. Because a circuit court's decision to grant an evidentiary hearing on a rule 3.851 motion is ultimately based on written materials before the court, its ruling is tantamount to a pure question of law, subject to de novo review. Long v. State, 183 So. 3d 342, 344 (Fla. 2016). Accordingly, when reviewing a court's summary denial of a successive rule 3.851 motion, this Court accepts the movant's factual allegations as true to the extent they are not refuted by the record and will affirm the ruling if the record conclusively shows that the movant is entitled to no relief. See Van Poyck v. State, 116 So. 3d 347, 354 (Fla. 2013); Jones v. State, 998 So. 2d 573, 587 (Fla. 2008); McLin v. State, 827 So. 2d 948, 954 (Fla. 2002); see generally Fla. R. Crim. P. 3.851(f)(5)(B) ("If the motion, files, and records in the case conclusively show that the movant is entitled to no relief, the motion may be denied without an evidentiary hearing.").

### A. Newly Discovered Evidence

Asay raises his newly discovered evidence claim based on the sworn affidavit of ballistics expert William A. Tobin, Ph.D. The summary denial of a

newly discovered evidence claim will be upheld if the motion is legally insufficient or its allegations are conclusively refuted by the record. McLin, 827 So. 2d at 954. To prevail on a claim of newly discovered evidence, a defendant must show:

> (1) the asserted facts "must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of due diligence"; and (2) the newly discovered evidence "must be of such nature that it would probably produce an acquittal on retrial."

Lambrix v. State, 124 So. 3d 890, 896 (Fla. 2013). The newly discovered evidence will probably produce an acquittal on retrial if it "weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability." Hildwin v. State, 141 So. 3d 1178, 1181 (Fla. 2014) (quoting Jones v. State, 709 So. 2d 512, 526 (Fla. 1998)).

Applying the standard to this case, we agree with the circuit court's conclusion that Tobin's affidavit does not qualify as newly discovered evidence. New opinions or new research studies have routinely been rejected as newly discovered evidence. See Henry v. State, 125 So. 3d 745, 750-51 (Fla. 2013). Merely obtaining a new expert to review the same records does not create newly discovered evidence. See Howell v. State, 145 So. 3d 774, 775 (Fla. 2013).

However, this Court has found that a case-specific letter from the FBI based on a 2004 report by the National Research Council is newly discovered evidence. Wyatt v. State, 71 So. 3d 86, 100 (Fla. 2011). The 2004 report discredited the

science supporting the trial testimony of the FBI's own agent on comparative bullet lead analysis, and the letter provided a case-specific assessment from the FBI on how the report's findings could affect Wyatt's case. Id. at 95, 99. We found the letter to be newly discovered evidence because "[a]lthough the FBI did not actually write the letter until August 2008, more than fifteen years after Wyatt's trial, the flaws inherent in CBLA science were unknown or not publicly acknowledged at the time of trial." Id. at 100.

Here, Tobin's affidavit asserts that National Research Council reports from 2008 and 2009 show ballistic testimony in Asay's case was misleading. However, that affidavit cannot be considered newly discovered evidence in the same way as the case-specific letter from the FBI in Wyatt. Tobin is not a law enforcement agent seeking to correct his agency's prior testimony. See id. at 101; Smith v. State, 75 So. 3d 205, 206 (Fla. 2011). Further, one of the reports on which Tobin bases his affidavit was already itself rejected as newly discovered evidence in Johnston v. State, 27 So. 3d 11 (Fla. 2010), because the report cited to existing publications published years before Johnston raised his claim. Id. at 20-21. Obtaining an expert to review that same report does not convert it or the expert's report into newly discovered evidence. See generally, Howell, 145 So. 3d at 775. Thus, Asay has not provided any newly discovered evidence on which to base his claim. Because the record conclusively shows that he is not entitled to relief on his

newly discovered evidence claim, the circuit court did not err in denying an evidentiary hearing. Therefore, we deny relief on this claim.

## B. **Strickland** Claims

In the alternative to his Brady claims, discussed below, Asay alleges generally that if the evidence was not suppressed in violation of Brady, trial counsel was ineffective under Strickland for failing to adequately investigate or introduce the evidence at trial. The Brady/Strickland evidence concerns three circumstances that Asay alleges affect the facts of his case as presented at trial: initial police investigation into another suspect for the Booker murder, a witness's ownership of a gun fitting the profile of the murder weapon, and information impeaching Charlie Moore's testimony that Asay confessed to the McDowell murder.

The summary denial of an ineffective assistance of counsel claim will be upheld where the motion is legally insufficient or where the record conclusively refutes the allegations. See Jones, 998 So. 2d at 587. To succeed on a claim of ineffective assistance of trial counsel, a movant must show that trial counsel's performance fell "outside the broad range of reasonably competent performance under prevailing professional standards," and that this deficiency affected the proceeding so as to undermine confidence in the outcome at trial such that the

defendant was prejudiced by the deficiency.  Maxwell v. Wainwright, 490 So. 2d 927, 932 (Fla. 1986).

The impeachment evidence of Charlie Moore may not be considered for the purposes of this claim because it was previously raised as part of an ineffective assistance of counsel claim within Asay's initial postconviction motion.  See Asay II, 769 So. 2d at 978 n.5.  Asay's initial postconviction claim was based on an inconsistency about which trial counsel failed to question state witness Charlie Moore—specifically that Moore's testimony was presented at trial as a single conversation with law enforcement when, in fact, Moore did not tell police that Asay confessed to the McDowell murder until after he learned that his cousin Danny had done so in response to a television show, Crime Watch.  This is the exact piece of impeachment evidence which Asay offers in this proceeding.  Having reviewed the initial postconviction record, we find that as to this piece of evidence, the claim "fails to allege new or different grounds for relief and the prior determination was on the merits."  Fla. R. Crim. P. 3.851(e)(2).  Therefore, Asay's claim as to this evidence is procedurally barred.

As to the remaining evidence underlying Asay's Strickland claims, Asay did not plead his Strickland claim separately from his Brady claim before the circuit court, except to allege generally that "[t]o the extent that counsel was or should have been aware of this [Brady] information, counsel was ineffective in failing to

discover it and utilizing [sic] it." In addition, for the instant appeal, the Brady/Strickland claims were grouped with the newly discovered evidence claim, and Asay argued that this Court must find a Strickland violation if the evidence was not suppressed under Brady because Brady and Strickland are "two sides of the same coin."

We find that these conclusory allegations fail to demonstrate that trial counsel's performance was deficient or prejudiced Asay. See Jones 998 So. 2d at 587; Connor v. State, 979 So. 2d 852, 862 (Fla. 2007). Asay does not demonstrate how trial counsel was deficient or that counsel's performance fell outside of reasonable professional standards. As to prejudice, Asay alleges that the evidence would have allowed counsel to convey a narrative that, if believed by the jury, would probably undermine confidence in his conviction or sentence. However, whether the jury would believe this narrative is "mere speculation that fails to rise to the level of prejudice needed to establish an ineffective assistance of trial counsel claim." Nelson v. State, 73 So. 3d 77, 85 (Fla. 2011) (citing Johnson v. State, 921 So. 2d 490, 503-04 (Fla. 2005)). Because Asay has not demonstrated deficiency or prejudice, his Strickland claim is legally insufficient and the circuit court properly denied an evidentiary hearing. Jones, 998 So. 2d at 587. We deny relief on this claim.

### C. Brady Claims

The summary denial of a <u>Brady</u> claim is upheld if the motion is legally insufficient or its allegations are conclusively refuted by the record.  <u>See</u> <u>id.</u>  This Court discussed the elements of this claim in <u>Franqui v. State</u>, 59 So. 3d 82 (Fla. 2011):

> To demonstrate a <u>Brady</u> violation, the defendant has the burden to show (1) that favorable evidence, either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced.  To meet the materiality prong of <u>Brady</u>, the defendant must demonstrate a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. . . . [M]ateriality under <u>Brady</u> requires a probability sufficient to undermine confidence in the outcome.  [For t]he materiality inquiry . . . the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.  It is the net effect of the evidence that must be assessed.

<u>Id.</u> at 101-02 (internal citations omitted).

As noted above, Asay previously raised a <u>Strickland</u> claim based on the Charlie Moore impeachment evidence.  <u>See</u> <u>Asay II</u>, 769 So. 2d at 978 n.5. Because Asay has previously argued before this Court that trial counsel had this evidence and was deficient in failing to use it, he cannot now argue that the State suppressed the information for the purposes of a <u>Brady</u> claim.  Therefore, the record conclusively shows he is not entitled to relief based on that evidence.  <u>See</u> <u>Jones</u>, 998 So. 2d at 587.

- 42 -

As to the other Brady/Strickland evidence, Asay contends that the existence of another initial suspect and a witness's ownership of a gun fitting the profile of the murder weapon support speculation that Asay did not shoot Booker. Asay pleads generally that it is exculpatory, was suppressed by the State, and is material, such that he was prejudiced. However, the record conclusively shows that the alleged evidence is not material such that its alleged suppression prejudiced him. Franqui, 59 So. 3d at 102. The existence of another initial suspect and the fact that a witness owned a gun similar to the murder weapon cannot "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. Nor does that evidence create any dispute with the evidence the jury heard at trial. It does not refute medical examiner and witness testimony which link Asay to both murders. Because the record conclusively refutes Asay's Brady claim as to this remaining evidence, the circuit court properly denied an evidentiary hearing. See Jones, 998 So. 2d at 587. We affirm the denial.

## D. Cumulative Prejudice

Asay contends that his newly discovered evidence, when considered cumulatively with his Brady/Strickland evidence, undermines confidence in the results of his proceeding. See Swafford v. State, 125 So. 3d 760, 775 (Fla. 2013); Parker v. State, 89 So. 3d 844, 867 (Fla. 2011); Suggs v. State, 923 So. 2d 419, 441 (Fla. 2005); Jones, 709 So. 2d at 526. However, in this case, the record

conclusively shows that Asay's alleged newly discovered evidence does not constitute newly discovered evidence. The Brady/Strickland evidence with potential impeachment value against Charlie Moore is procedurally barred. Asay's Strickland claim is insufficient for failing to demonstrate deficiency or prejudice. Therefore, the only alleged error this Court could review for cumulative prejudice is Asay's Brady claim based on the evidence showing another initial suspect and a witness's ownership of a gun similar to the murder weapon. As noted in the Brady discussion above, the record conclusively shows that this evidence is not material such that it prejudiced Asay. As such, we find no cumulative prejudice.

## III. EXTRA RECORD MATERIAL AND EX PARTE HEARING

Asay next argues the circuit court violated his right to due process when it considered extra record material and conducted an ex parte hearing with the State. According to Asay, this demonstrates bias on behalf of the trial judge and requires her removal from the case. Each of these claims will be addressed in turn.

### A. Extra Record Material

Asay argues the circuit court considered extra record material in deciding his Brady claim. During the warrant litigation, the State Attorney's Office and the Jacksonville Sheriff's Office recreated their original disclosures of public records. The State attached these public records to an e-mail, sent them to Asay's counsel, and copied the e-mail to the circuit court. The attachments were not introduced

into evidence. At the Huff hearing, the State read from the deposition of Detective Housend in support of its position that it did not suppress information regarding Roland Pough as a possible suspect. The State also repeatedly referred to a homicide continuation report from the public records provided by the Jacksonville Sheriff's Office. The circuit court relied on these records to deny Asay's Brady claim that Detective Housend failed to provide trial counsel with information about Roland Pough as a suspect in Booker's shooting. Both documents were part of the public records sent to Asay's counsel and the circuit court via e-mail, and defense counsel made no objection to the use of the records during the hearing.

Generally, to raise an error on appeal, a contemporaneous objection must be made at the trial level when the alleged error occurs. J.B. v. State, 705 So. 2d 1376, 1378 (Fla. 1998). Only when an error is fundamental can it be raised on appeal in the absence of a contemporaneous objection. Crump v. State, 622 So. 2d 963, 972 (Fla. 1993). An error is fundamental when it goes to the foundation of the case or the merits of the cause of action and is equivalent to a denial of due process. State v. Johnson, 616 So. 2d 1, 3 (Fla. 1993). Further, it is " '[t]he essence of due process . . . that fair notice and reasonable opportunity to be heard must be given to interested parties before judgment is rendered.' " Huff v. State, 622 So. 2d 982, 983 (Fla. 1993) (quoting Scull v. State, 569 So. 2d 1251, 1252 (Fla. 1990)).

Here, Asay failed to object to the circuit court's receipt of the public records via e-mail. He also failed to object when the State read from the public records during the Huff hearing. If Asay had objected at either time, he would have had the opportunity to be heard. Consequently, Asay fails to establish a lack of notice and opportunity to be heard as to the circuit court's receipt of the public records. Because there was no violation of due process, the circuit court's reliance on the public records in its final order does not amount to fundamental error, and Asay is barred from raising this issue on appeal.

### B. Ex Parte Hearing

Asay also contends that the circuit court conducted an ex parte hearing with the State. On February 4, 2016, at approximately 12:45 p.m., Asay's counsel e-mailed the State, writing that he intended to file a proffer containing unredacted materials. The Office of the Attorney General e-mailed back at 12:58 p.m. that the State objected because any proffer after the circuit court's ruling was improper. Asay's counsel responded that he still intended to file the proffer. At 2:31 p.m., the State filed a motion to prohibit the proffer. The trial judge's judicial assistant attempted to arrange a hearing on the State's motion; however, Asay's counsel responded that he would not be available at all that day.

At 3:02 p.m., the State e-mailed Asay's counsel a notice of hearing via the e-portal. At 3:14 p.m., the judge e-mailed Asay's counsel that the hearing could be

moved to a later time but needed to be held before 5 p.m. that day. At 3:15 p.m., the trial court held a hearing on the State's motion without opposing counsel present. During the hearing, the circuit court noted that it received e-mails from Asay's counsel that he intended to file unredacted police reports along with a Notice of Proffer. The circuit court also noted, however, that all proceedings were to be completed by February 3 according to this Court's Scheduling Order. Thus, the circuit court stated that it had not reviewed and would not review the e-mails, and then sealed, filed, and labeled the e-mails as exhibits Two and Three to be submitted to this Court to preserve the matter. After the hearing, at 4:06 p.m., Asay's counsel e-mailed the judge that he was not available and had not been given adequate notice.

Generally, a judge should not engage in ex parte communications with any party. See Smith v. State, 708 So. 2d 253, 255 (Fla. 1998). The hearing at issue here was an ex parte communication, a fact the State conceded during the hearing. However, Asay was not prejudiced by this non-substantive hearing. The circuit court only went on record to acknowledge it received the e-mails and the State's motion and to explain that review of the proffered material would not be possible in order to adhere to this Court's Scheduling Order. While due process requires notice and opportunity to be heard before judgment is rendered, no judgment was rendered at the hearing. The court did not review the e-mails or rule on the State's

- 47 -

motion.  Instead, the court sealed the e-mails to preserve the issue for this Court.

Consequently, Asay fails to establish how he was adversely affected by the hearing

or how the proceedings establish bias on the part of the circuit court judge.

Although the circuit court reviewed extra record material and conducted an

ex parte hearing with the State, Asay is not entitled to relief as to either claim.

Moreover, because Asay fails to establish prejudice, his claim that the circuit court

judge was biased is meritless.  Additionally, Asay did not file a motion to

disqualify the judge.  Therefore, the claim of bias is also procedurally barred.

Asay is not entitled to relief as to this second issue.

## IV.  DUE PROCESS, EQUAL PROTECTION, AND SPALDING V. DUGGER CLAIMS

Next, Asay argues he was denied due process, equal protection, and the right

to effective collateral representation under Spalding, 526 So. 2d at 72, when his

death warrant was signed while no registry counsel was in place and had not been

in place for over a decade.  In 2005, Asay's postconviction counsel, Dale Westling,

withdrew from the case when it moved into federal court.  Asay was not

represented by registry counsel again until his death warrant was signed in January

2016.  Following that appointment, it was discovered that many of Asay's records

were lost or damaged.

Asay contends that the lack of counsel for ten years violated his right to due

process and equal protection.  Moreover, Asay argues that the court's late

appointment of counsel and the lack of records rendered his counsel's performance ineffective. In response, the State argues that defendants have no constitutional right to postconviction counsel, Asay was represented by counsel at every stage of his proceedings, and neither late appointment of registry counsel nor lost records violate due process. The standard of review is de novo.

## A. Due Process

Due process requires that a defendant be given notice and an opportunity to be heard on a matter before it is decided. Huff, 622 So. 2d at 983. While Asay argues that his lack of registry counsel violated his right to due process, he fails to state when he was denied notice or opportunity to be heard at any stage of his postconviction proceedings. Asay appears to suggest that postconviction counsel was required to actively investigate his case for the preceding ten years and continuously bring forth new arguments. However, this is not mandated by section 27.710, Florida Statutes. Instead, counsel is only required to represent the defendant "until the sentence is reversed, reduced, or carried out or until released by order of the trial court." § 27.710(4), Fla. Stat.

Here, Asay was represented by counsel at every stage of his postconviction proceedings. Steve Kissinger represented Asay during the initial postconviction proceedings, and Dale Westling represented Asay during the successive postconviction proceedings. In 2005, Mr. Westling filed a motion to withdraw

- 49 -

when the case moved from state court to federal court. The trial court granted the motion. In federal court, at least two attorneys represented Asay at various stages of the proceedings. When the death warrant was signed in January of 2016, the trial court appointed new registry counsel. At no point was Asay not represented by counsel. Furthermore, Asay had notice of each postconviction proceeding and the opportunity to have counsel argue his claims before the court. Thus, his due process argument fails.

## B. Equal Protection

Asay's equal protection argument also fails. Disparate treatment of similarly situated defendants is a violation of equal protection. See Duncan v. Moore, 754 So. 2d 708, 712 (Fla. 2000). However, Asay does not demonstrate how he was treated differently from similarly situated defendants. As previously explained, Asay has been represented by counsel at every stage of his proceedings as required by statute. While he contends that counsel's withdrawal resulted in disparate treatment, the statute allows counsel to withdraw from the case with permission of the trial court. Here, Asay does not show how withdrawal of counsel resulted in disparate treatment when any defendant's postconviction counsel can withdraw with permission from the trial court. Thus, we find that Asay is not entitled to relief on this claim.

## C. Ineffective Assistance of Counsel

Finally, Asay argues that the late appointment of registry counsel and the lack of records rendered counsel's assistance ineffective and violated his right to due process. Asay cites Spalding in support of his claim. However, Spalding only requires that a defendant be represented by an attorney during postconviction proceedings. Id. at 72. Therefore, Spalding does not entitle Asay to the relief he requests. To the extent that Asay is instead attempting to argue ineffective assistance of counsel, this Court has repeatedly held that defendants are not entitled to effective assistance of collateral counsel. See Gore v. State, 91 So. 3d 769, 778 (Fla. 2012) (explaining that there is no independent cause of action for ineffective assistance of collateral counsel in Florida); Zack v. State, 911 So. 2d 1190, 1203 (Fla. 2005) ("Under Florida and federal law, a defendant has no constitutional right to effective collateral counsel.").

Furthermore, the lack of records does not amount to a due process violation. This is a pre-repository case, so the documents from the initial postconviction proceedings in state court were not archived. However, the Office of the Attorney General copied the entire appellate record in state court including the direct appeal, the initial postconviction proceedings, and the successive postconviction proceedings. The Department of Corrections provided counsel with Asay's entire medical record, as well as the entire inmate file. The State Attorney's Office provided counsel with its entire file, which included many of the original public

records requests made during the initial postconviction proceedings. Additionally, the Florida Department of Law Enforcement and the Jacksonville Sheriff's Office provided counsel with all the materials they had. Every state agency involved attempted to recreate the records.

However, even if some records have been permanently lost or destroyed, the loss or destruction of files does not necessarily amount to a due process violation. See, e.g., Jones v. State, 928 So. 2d 1178, 1192 (Fla. 2006) (rejecting a due process challenge to the capital collateral proceedings where trial counsel's files were destroyed in a fire). Additionally, Asay's counsel does not identify what records were not available, or what particular argument he is prevented from making due to a lack of records. Consequently, we deny relief as to this issue.

## CONCLUSION

Because Asay has failed to demonstrate that he is entitled to relief as to any of his claims, we affirm the circuit court's summary denial of his motion for postconviction relief and deny his petition to this Court for a writ of habeas corpus. Additionally, we lift the stay entered on March 2, 2016.

It is so ordered.

LABARGA, C.J., and QUINCE, and POLSTON, JJ., concur.
LABARGA, C.J., concurs with an opinion.
POLSTON, J., concurs with an opinion.
LEWIS, J., concurs in result with an opinion.
CANADY, J., concurs in result only.
PARIENTE, J., concurs in part and dissents in part with an opinion.

- 52 -

PERRY, J., dissents with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND
IF FILED, DETERMINED.

LABARGA, C.J., concurring.

I concur in the conclusion of the majority that Hurst v. Florida and Hurst do

not apply retroactively to those defendants whose death sentences became final

prior to the issuance of Ring.  However, I write separately to express my view that

our decision today does not apply to those defendants whose death sentences were

imposed based upon, and who are facing execution solely as a result of, a judicial

override.  There are only two death row defendants who satisfy this criteria—

Matthew Marshall and William Zeigler, Jr.[19]  The impact of Hurst v. Florida and

Hurst upon their death sentences is an issue for another day.

---

19.  There is a third defendant who has a death sentence as a result of an
override—Edward J. Zakrzewski, II.  However, Zakrzewski received two
additional death sentences for murders for which a jury issued recommendations of
death.  See Zakrzewski v. State, 717 So. 2d 488, 491 (Fla. 1998).  Therefore,
Zakrzewski is not subject to execution purely by virtue of the actions of a judge.

POLSTON, J., concurring.

I agree with the majority that Hurst v. Florida, 136 S. Ct. 616 (2016), does not apply retroactively to cases that were final when Ring v. Arizona, 536 U.S. 584 (2002), was decided. To be clear, this decision does not address whether Hurst v. Florida applies retroactively to those cases that were not final when Ring was decided but were final when Hurst v. Florida was decided.

However, while I agree with the majority that Hurst v. Florida is not retroactive to pre-Ring cases under Witt v. State, 387 So. 2d 922 (Fla. 1980), I believe that the retroactivity analysis the United States Supreme Court announced in Teague v. Lane, 489 U.S. 288 (1989), is the proper and applicable test. See Johnson v. State, 904 So. 2d 400, 413 (Fla. 2005) (Cantero, J., concurring). I also continue to dissent to the majority's expansion of the meaning of Hurst v. Florida as well as the majority's holding that chapter 2016-13, Laws of Florida, is unconstitutional. See Hurst v. State, 202 So. 3d 40, 77-83 (Fla. 2016) (Canady, J., dissenting); Perry v. State, 41 Fla. L. Weekly S449 (Fla. Oct. 14, 2016) (Canady, J., concurring in part and dissenting in part).

LEWIS, J., concurring in result.

I agree with most of the conclusions set forth in the majority opinion. However, in my view, the majority opinion has incorrectly limited the retroactive

application of Hurst by barring relief to even those defendants who, prior to Ring, had properly asserted, presented, and preserved challenges to the lack of jury factfinding and unanimity in Florida's capital sentencing procedure at the trial level and on direct appeal, the underlying gravamen of this entire issue. In this case, Asay did not raise a Sixth Amendment challenge prior to the case named Ring arriving. See majority op. at 12 n.12. Therefore, I agree that he is not entitled to relief, and I concur in result. However, I write separately to explain my disagreement with the Hurst retroactivity issue as adopted by this Court.

Many courts struggle with the "staggeringly intricate body of law governing the question whether new constitutional doctrines should be 'retroactively' or 'prospectively' applied." Witt v. State, 387 So. 2d 922, 925 (Fla. 1980) (quoting Paul M. Bator et al., Hart & Wechsler's The Federal Court and the Federal System 1477 (2d ed. 1973)). This Court need not tumble down the dizzying rabbit hole of untenable line drawing; instead, the Court could simply entertain Hurst claims for those defendants who properly presented and preserved the substance of the issue, even before Ring arrived. This is consistent with the precedent of this Court. In James v. State, 615 So. 2d 668, 669 (Fla. 1993), we granted relief to a defendant who had asserted at trial and on direct appeal that the jury instruction pertaining to the heinous, atrocious, or cruel aggravating circumstance was unconstitutionally vague before the United States Supreme Court ultimately reached that same

conclusion in <u>Espinosa v. Florida</u>, 505 U.S. 1079 (1992). We concluded that—despite his case becoming final before the principle of law had a case name—it would be unjust to deprive James of the benefit of the Supreme Court's holding in <u>Espinosa</u> after he had properly presented and preserved such a claim. <u>James</u>, 615 So. 2d at 669. Similarly, I believe that defendants who properly preserved the substance of a <u>Ring</u> challenge at trial and on direct appeal prior to that decision should also be entitled to have their constitutional challenges heard.

Preservation of the issue is perhaps the most basic tenet of appellate review, <u>see</u> <u>Steinhorst v. State</u>, 412 So. 2d 332, 338 (Fla. 1982); and this Court should be particularly cognizant of preservation issues for capital defendants. Accordingly, the fact that some defendants specifically cited the name <u>Ring</u> while others did not is not dispositive. Rather, the proper inquiry centers on whether a defendant preserved his or her substantive constitutional claim to which and for which <u>Hurst</u> applies.[20] This preservation approach—enshrined in <u>James</u>—ameliorates some of the majority's concern with the effect on the administration of justice. Defendants, like Asay, who did not properly preserve their constitutional challenges, forfeited them just as any other defendant who fails to raise and preserve a claim. However, those defendants who challenged Florida's

_____

20. <u>See</u> L. Anita Richardson & Leonard B. Mandell, <u>Fairness Over Fortuity: Retroactivity Revisited and Revised</u>, 1989 Utah L. Rev. 11, 56-57 (1989).

unconstitutional sentencing scheme based on the substantive matters addressed in

Hurst are entitled to consideration of that constitutional challenge.

Jurists have echoed this type of approach as a remedy to the more exacting

federal Teague standard.[21] Federal courts have employed a similar preservation

approach, and it is "one of the dominant means by which federal courts limit the

disruptive effects of legal change in the context of direct review of federal criminal

convictions."[22] Regardless of the limited federal approach, scholars urge state

courts to pull retroactivity off Teague's constitutional floor,[23] which the Supreme

Court expressly permitted in Danforth v. Minnesota. 552 U.S. 264, 280 (2008).

This Court's adoption of the Stovall/Linkletter standard was intended to

provide "more expansive retroactivity standards" than those of Teague. Johnson v.

State, 904 So. 2d 400, 409 (Fla. 2005). However, the Court's retroactivity decision

today eschews that intention. Further, it illuminates Justice Harlan's famous

critique of Linkletter:

---

21. Tung Yin, A Better Mousetrap: Procedural Default as a Retroactivity Alternative to Teague v. Lane and the Antiterrorism and Effective Death Penalty Act of 1996, 25 Am. J. Crim. L. 203, 232 (1998).

22. Toby J. Heytens, Managing Transitional Moments in Criminal Cases, 115 Yale L.J. 922, 942 (2006).

23. Christopher N. Lasch, The Future of Teague Retroactivity, or "Redressability," After Danforth v. Minnesota: Why Lower Courts Should Give Retroactive Effect to New Constitutional Rules of Criminal Procedure in Postconviction Proceedings, 46 Am. Crim. L. Rev. 1, 51-54 (2009).

> Simply fishing one case from the stream of appellate review . . . and then permitting a stream of similar cases subsequently to flow by unaffected by that new rule constitute[s] an indefensible departure from this model of judicial review.

Williams v. United States, 401 U.S. 667, 679 (1971) (Harlan, J., concurring in part and dissenting in part).  As Justice Perry noted in his dissent, there is no salient difference between June 23 and June 24, 2002—the days before and after the case name Ring arrived.  See Perry, J., dissenting op. at 73.  However, that is where the majority opinion draws its determinative, albeit arbitrary, line.  As a result, Florida will treat similarly situated defendants differently—here, the difference between life and death—for potentially the simple reason of one defendant's docket delay.  Vindication of these constitutional rights cannot be reduced to either fatal or fortuitous accidents of timing.[24]

Every pre-Ring defendant has been found by a jury to have wrongfully murdered his or her victim.  With full knowledge that some defendants properly preserved challenges to their unconstitutional sentences, this Court now limits the application of Hurst, resulting in the State wrongfully executing those defendants.  It seems axiomatic that "two wrongs don't make a right"; yet, this Court essentially

---

24.  See generally, Christopher M. Smith, Schriro v. Summerlin: A Fatal Accident of Timing, 54 DePaul L. Rev. 1325 (2005).

condones that outcome with its very limited interpretation of <u>Hurst</u>'s retroactivity and application.

PARIENTE, J., concurring in part and dissenting in part.

Our recent decision in <u>Hurst</u>[25] is undoubtedly a decision of fundamental constitutional significance based not only on the United States Supreme Court's decision in <u>Hurst v. Florida</u>,[26] but also on Florida's separate constitutional right to trial by jury under article I, section 22, of the Florida Constitution. Not only did the United States Supreme Court hold that Florida's capital sentencing scheme was unconstitutional based on the Sixth Amendment to the United States Constitution, but this Court also held in <u>Hurst</u> that capital defendants are entitled to unanimous jury findings of each aggravating factor, that the aggravating factors are sufficient to impose death, and that the aggravating factors outweigh the mitigating circumstances and a unanimous jury recommendation of death as part of Florida's constitutional right to a trial by jury under article I, section 22, of the Florida Constitution. <u>Hurst</u>, 202 So. 3d at 44.

Applying decisions of fundamental constitutional significance retroactively to defendants in similar circumstances is essential to "ensuring fairness and

---

25. <u>Hurst v. State</u> (<u>Hurst</u>), 202 So. 3d 40 (Fla. 2016).

26. <u>Hurst v. Florida</u> (<u>Hurst v. Florida</u>), 136 S. Ct. 616 (2016).

uniformity in individual adjudications." Witt v. State, 387 So. 2d 922, 925 (Fla.

1980).[27]  This Court has always recognized that "death is different," so we must be

extraordinarily vigilant in ensuring that the death penalty is not arbitrarily

imposed.[28]  Therefore, I dissent from the majority's holding not to apply Hurst

retroactively to all death sentences that were imposed under Florida's

unconstitutional capital sentencing scheme.[29]

In Hurst, we emphasized the importance of unanimity in jury decisions,

stating: "If death is to be imposed, unanimous jury sentencing recommendations,

when made in conjunction with the other critical findings unanimously found by

the jury, provide the highest degree of reliability in meeting these constitutional

requirements in the capital sentencing process."  202 So. 3d at 60.  In fact, the

majority acknowledges the importance of our holding in Hurst:

> [T]he ultimate decision of whether a defendant lives or dies rests on
> these factual findings, only strengthening the purpose of the new rule.
> Both this Court and the Supreme Court have recognized that "death is

27.  See Witt, 387 So. 2d at 925 ("Considerations of fairness and uniformity make it very difficult to justify depriving a person of his liberty or his life, under process no longer considered acceptable and no longer applied to indistinguishable cases.").

28.  See, e.g., Johnson v. State, 904 So. 2d 400, n.14 (Fla. 2005) (Anstead, J., concurring in part and dissenting in part) (explaining other contexts in which this Court has granted retroactive application of new precedent).

29.  I agree with the majority's denial of relief on Asay's second, third, and fourth claims respectively, and thus would not overturn Asay's conviction. Majority op. at 10-11, 52.

different." See, e.g., Yacob v. State, 136 So. 3d 539, 546 (Fla. 2014) (quoting Fitzpatrick v. State, 527 So. 2d 809, 811 (Fla. 1988)); Ring, 536 U.S. at 605. Thus, in death cases, this Court has taken care to ensure all necessary constitutional protections are in place before one forfeits his or her life, and the purpose of the new rule weighs in favor of applying Hurst v. Florida retroactively to Asay.

Majority op. at 27.

The majority's decision will have an immediate effect on Asay, who is the subject of a pending death warrant. Majority op. at 2. In my view, by limiting the retroactivity of the rights explained in Hurst v. Florida and Hurst, the majority discounts the significance of the unanimity requirement imposed by this Court's holding in Hurst and applied in our holding in Perry v. State, 41 Fla. L. Weekly S449 (Fla. Oct. 14, 2016), invalidating Florida's revised 2016 death penalty sentencing statute for its failure to require unanimity in the jury's final recommendation of death. While I cannot agree with Justice Perry's interpretation and application of section 775.082(2), Florida Statutes, which would reduce every final death sentence to life after Hurst v. Florida, I agree that a faithful application of the Witt test for retroactivity compels full retroactivity of Hurst. A faithful Witt analysis includes consideration of the uniqueness and finality of the death penalty, together with the fundamental constitutional rights at stake when the State sentences someone to death—namely the right to trial by jury and sentencing by a unanimous jury as guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 22, of the Florida Constitution.

Ultimately, when applying the retroactivity equation of balancing "the justice system's goals of fairness and finality" in this circumstance, fairness must prevail over finality. Ferguson v. State, 789 So. 2d 306, 312 (Fla. 2001). I recognize, as does the majority, the victims and their families' "need for finality" but stress, as does Justice Perry in his dissent, that no conviction shall be disturbed. Majority op. at 35; see Asay, No. SC16-223, slip op. at 75 (Perry, J., dissenting). The question is not of guilt or innocence but, rather, of life or death.

A retroactivity analysis under Witt consists of three prongs. Witt, 387 So. 2d at 931. The majority opinion explains how the Hurst v. Florida decision meets the first two prongs of a Witt retroactivity analysis; it undoubtedly emanates from the United States Supreme Court and is clearly constitutional in nature. Majority op. at 24; see Witt, 387 So. 2d at 931. Likewise, our opinion in Hurst interpreted the United States Supreme Court's opinion in Hurst v. Florida and Florida's own constitutional right to jury trial. See art. I, § 22, Fla. Const. As to the third prong of the Witt analysis, I conclude, as I explain below, that the requirement of jury unanimity in the ultimate decision as to whether a defendant is sentenced to death is of such fundamental significance that fairness requires us to also apply Hurst retroactively to all capital defendants in Florida. This third prong, which asks whether the decision is of sufficient magnitude to require retroactive application, is

reviewed under the three factors of the Stovall[30]/Linkletter[31] test: examining the purpose of the rule, the extent of reliance on the prior rule, and the effect of retroactive application of the new rule on the administration of justice. Witt, 387 So. 2d at 926 (citations omitted).

As to the importance of the right to trial by jury, the majority appropriately explains that the purpose to be served by the rule weighs in favor of applying Hurst retroactively:

> The importance of the right to a jury trial has been recognized since this country's inception and is the only right to appear in both the body of the Constitution and the Bill of Rights. Art. III, § 2, U.S. Const.; U.S. Const. amend. VI. In fact, in the very line of cases at issue here, the United States Supreme Court has recognized that the right to a jury's determination of all the elements of an offense is of utmost importance, thereby changing its previous position that "sentencing considerations" were an exception to the rule. See Apprendi, 530 U.S. at 476 ("At stake in this case are constitutional protections of surpassing importance."); see also Ring, 536 U.S. at 609 ("Because . . . aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." (citation omitted) (emphasis added)).
>
> Likewise, in Florida, this Court has "always considered the right to jury trial an indispensable component of our system of justice." Blair v. State, 698 So. 2d 1210, 1213 (Fla. 1997). In fact, Florida's first Constitution declared, "That the great and essential principles of liberty and free government, may be recognized and established, we declare: . . . That the right of trial by jury, shall for ever remain inviolate." Art. I, § 6, Fla. Const. (1838). This Court has

---

30. Stovall v. Denno, 388 U.S. 293 (1967).

31. Linkletter v. Walker, 381 U.S. 618 (1965).

consistently recognized the importance of a defendant's right to a jury trial, calling it "indisputably one of the most basic rights guaranteed by our constitution." State v. Griffith, 561 So. 2d 528, 530 (Fla. 1990).

> The underpinnings of Hurst v. Florida, requiring that the jury make all the factual findings necessary to impose a death sentence, are based on the critical right to a jury trial: one of the guarantees set forth in the Bill of Rights since our country's—and this State's—inception. The right to a jury trial not only ensures a defendant's guilt is accurately determined, but also that any decision on the matter is made by a group of the defendant's peers—as opposed to a member of the government. Our citizens place their trust in our criminal justice system in large part because the citizens themselves are the crucial element in determining a defendant's guilt or innocence.

Majority op. at 25-26. In light of our recent holding in Hurst, emphasizing the fundamental constitutional significance of the right to trial by jury under both the United States and Florida Constitutions and the role unanimity plays in ensuring fairness and reliability in the imposition of death, I agree with the majority that the purpose of the new rule weighs in favor of retroactive application.

Further emphasizing the importance of the right to trial by jury, Justice Anstead explained in his concurring in part and dissenting in part opinion in Johnson v. State, 904 So. 2d 400 (Fla. 2005), why Ring should not only apply in Florida but should apply retroactively:

> The right to a jury trial is not only recognized as the most important right involving our justice system set out in our constitution, its roots rest in the most revered legal document of our Anglo-American legal tradition, the Magna Carta. Countless thousands of English and American patriots have recognized and defended the right of jury trial as the very foundation of our justice system. In 1762, David Hume, the English philosopher, wrote that "trial by jury is the best institution

calculated for the preservation of liberty and the administration of justice that was ever devised by the wit of man." Similarly, Thomas Jefferson declared in 1788, "I consider trial by jury as the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution." See J. Kendall Few, In Defense of Trial by Jury 214, 311, American Jury Trial Foundation (1993). . . . Indeed, this Court's first chief justice, Chief Justice Douglas, eloquently assessed the importance of this right in 1848 when he spoke for a unanimous Court in declaring:

> When however it is remembered with what jealous and scrupulous regard "the right of trial by jury" has ever been cherished and preserved by our Anglo Saxon ancestors, and by the Fathers of the revolution of 1776, a regard transmitted to us their descendants not only with unabated attachment, but if possible with increased interest and regard—a Magna Charta shielding every one in the enjoyment of life liberty and property: When these things are borne in mind and a Legislative act in its terms abridges this hallowed right, or its provisions are subversive of the principles of natural justice and against common reason and common right, the duty of the court, though unpleasant and even painful, is too obvious to be doubted or denied.

Flint River Steam Boat Co. v. Roberts, Allen & Co., 2 Fla. 102, 115 (1848).

Johnson, 904 So. 2d at 427-28.

Turning to the extent of reliance on the old rule, which the majority states is the "most important factor" when determining whether the new rule constitutes a development of fundamental significance, the majority determines that this factor militates against a finding of retroactivity due to the number of defendants currently on Florida's death row and the number of executions in this State since 1976. Majority op. at 27, 31. Presumably, then, under that same reasoning, if

- 65 -

there were fewer defendants currently on death row and fewer executions in this State since 1976, this Court might have held <u>Hurst</u> to be fully retroactive. But, in fact, <u>Witt</u> does not elevate this factor above the others when conducting a retroactivity analysis because the three prongs are intertwined to assist the Court in determining when fairness must yield to finality.

I would conclude that <u>Hurst</u> creates the rare situation in which finality yields to fundamental fairness in order to ensure that the constitutional rights of all capital defendants in Florida are upheld.[32] <u>Witt</u>, 387 So. 2d at 925; <u>Ferguson</u>, 789 So. 2d at 312. As Chief Justice Strine of the Supreme Court of Delaware stated in his recent concurrence in <u>Rauf v. Delaware</u>, a decision that invalidated Delaware's capital sentencing scheme in light of the United States Supreme Court's decision in

---

32. Even under the majority's holding today, relief should be granted to the two Florida death row inmates whose sentences were a result of a judicial override because the jurisprudence on the acceptability of judicial overrides has so dramatically changed since their sentences were finalized. <u>Marshall v. State</u>, 604 So. 2d 799 (Fla. 1992); <u>Marshall v. State</u>, No. SC16-779 (pending); <u>Zeigler v. State</u>, 402 So. 2d 365 (Fla. 1981); <u>see</u> <u>Zeigler v. State</u>, No. SC16-1498 (pending); <u>see also</u> <u>Hurst v. Florida</u>, 136 S. Ct. at 626 (Alito, J., dissenting) ("No Florida trial court has overruled a jury's recommendation of a life sentence for more than 15 years."); <u>see also</u> <u>Asay</u>, slip op. at 53 (Labarga, C.J., concurring).

<u>Hurst</u>, and which the Delaware Supreme Court recently held applies retroactively under the more restrictive <u>Teague</u>[33] test:[34]

> If U.S. Supreme Court jurisprudence has and therefore can turn on a determination that death is different, it is certainly appropriate to recognize that the decision to give death or life is the most important one that can be made in any criminal trial, and that the Sixth Amendment right was understood as of its adoption and for much of our history as allocating that authority to the jury.

<u>Rauf v. Delaware</u>, 145 A.3d 430, 473 (Del. 2016) (Strine, C.J., concurring) (footnotes omitted).

Maintaining the focus on fairness, I turn to the third prong of the <u>Stovall</u>/<u>Linkletter</u> test: the effect on the administration of justice. As this Court stated in <u>Witt</u>, "society recognizes that a sweeping change of law can so drastically alter the substantive or procedural underpinnings of a final conviction and sentence that the machinery of post-conviction relief is necessary to avoid individual instances of obvious injustice." 387 So. 2d at 925. When determining whether someone lives or dies, requiring that a jury determine unanimously that the death penalty be imposed—after carefully determining which aggravators exist, weighing the sufficiency of the aggravators, determining that the aggravating

---

33. <u>Teague v. Lane</u>, 489 U.S. 288 (1989); <u>see</u> <u>Asay</u>, slip op. at 54 (Polston, J., concurring).

34. <u>See</u> <u>Powell v. Delaware</u>, No. 310, 2016, 2016 WL 7243546 (Del. Dec. 15, 2016).

factors outweigh the mitigating circumstances—"promotes a thorough and reasoned resolution," thereby stabilizing capital sentencing by ensuring that sentences of death are constitutional.[35] Undoubtedly, the justice system would be affected if this Court applied Hurst retroactively to all defendants on death row in Florida, but I conclude that this impact does not justify the injustice that results from not granting relief to all eligible capital defendants presently on Florida's death row.

For these reasons, I conclude that Hurst should apply to all defendants who were sentenced to death under Florida's prior, unconstitutional capital sentencing scheme. The majority's conclusion results in an unintended arbitrariness as to who receives relief depending on when the defendant was sentenced or, in some cases, resentenced. For example, many defendants whose crimes were committed before 2002 will receive the benefit of Hurst because they were previously granted a resentencing on other grounds and their newest death sentence was not final when Ring was decided.[36] To avoid such arbitrariness and to ensure uniformity and

---

35. Am. Bar Ass'n Death Penalty Due Process Rev. Project Sec. of Inidivudal Rights & Resps., Report to the House of Delegates (Feb. 2015), http://www.americanbar.org/content/dam/aba/uncategorized/Death_Penalty_Repre sentation/2015_my_108a.authcheckdam.pdf, at 3-4; accord Ferguson, 789 So. 2d at 312.

36. See, e.g., Johnson v. State, 44 So. 3d 51 (Fla. 2010) (vacating the sentences of death and remanding for a new penalty phase hearing on a conviction

fundamental fairness in Florida's capital sentencing, our opinion in <u>Hurst</u> should be applied retroactively to all death sentences. Thus, I would apply <u>Hurst</u> retroactively to Asay.

Because I would apply <u>Hurst</u> to Asay's case, I now turn to whether the <u>Hurst</u> error in Asay's penalty phase was harmless beyond a reasonable doubt. On remand from the United States Supreme Court, this Court determined that such error is capable of harmless error review and set forth the test for such review. <u>Hurst</u>, 202 So. 3d at 66-68. In Asay's case, the penalty phase jury recommended death by a vote of nine to three. Because there was no special verdict, we do not know why the three dissenting jurors did not vote to recommend death—whether they did not find that sufficient aggravating factors existed or did not find that sufficient aggravating factors outweighed the mitigating circumstances, or whether three jurors otherwise determined that death for this twenty-three-year-old was not the appropriate punishment. Thus, it cannot be said that the lack of unanimity was harmless beyond a reasonable doubt, and I would therefore conclude that Asay is entitled to a new penalty phase.

PERRY, J., dissenting.

---

from a murder in 1981). Johnson currently has an appeal pending before this Court where he claims entitlement to relief based on Hurst. <u>See</u> case No. SC14-1175.

I cannot agree with the majority's decision to limit the retroactive application of Hurst v. Florida to those cases that were not final when the United States Supreme Court decided Ring. In my opinion, the line drawn by the majority is arbitrary and cannot withstand scrutiny under the Eighth Amendment because it creates an arbitrary application of law to two groups of similarly situated persons. Coupled with Florida's troubled history in applying the death penalty in a discriminatory manner,[37] I believe that such an application is unconstitutional. I therefore dissent.

Asay will be the first white person executed for the murder of a black person in this State. See Frank R. Baumgartner, The Impact of Race, Gender, and Geography on Florida Executions, http://www.unc.edu/~fbaum/articles/Baumgartner-Florida-executions-Jan2016.pdf (January 14, 2016); ("No White person has been executed in Florida for a homicide involving a Black victim. In contrast, 71 percent of the executions carried out against Black inmates were for homicides involving White victims."); see also Michael Radelet, Glenn L. Pierce, Choosing Those Who Will Die: Race

---

37. I am aware of the irony of this statement in this particular case. It does not escape me that Mark Asay is a terrible bigot whose hate crimes are some of the most deplorable this State has seen in recent history. However, it is my sworn duty to uphold the constitution of this state and of these United States and not to ensure retribution against those whose crimes I find personally offensive.

and the Death Penalty in Florida, 43 Fla. L. Rev. 1 (1991). This sad statistic is a reflection of the bitter reality that the death penalty is applied in a biased and discriminatory fashion, even today. Indeed, as my retirement approaches, I feel compelled to follow other justices who, in the twilight of their judicial careers, determined to no longer "tinker with the machinery of death." See, e.g., Callins v. Collins, 510 U.S. 1141, 1145 (1994) (Blackmun, J., dissenting). The majority's decision today leads me to declare that I no longer believe that there is a method of which the State can avail itself to impose the death penalty in a constitutional manner. Because the majority of this Court has already determined that Asay will be executed for his crimes, I limit the remainder of my discussion to the application of Hurst v. Florida to this case.

I would find that Hurst v. Florida applies retroactively, period. I therefore would not limit its application to cases final after June 24, 2002, when the United States Supreme Court issued its decision in Ring. I can find no support in the jurisprudence of this Court where we have previously determined that a case is only retroactive to a date certain in time. Indeed, retroactivity is a binary—either something is retroactive, has effect on the past, or it is not.

The majority's opinion is inconsistent with our analysis of principles of fairness in our recent decision Falcon v. State, 162 So. 3d 954 (Fla. 2015). In Falcon, this Court stated that the principles of fairness underlying the Witt analysis

"make it very difficult to justify depriving a person of his liberty or his life, under process no longer considered acceptable and no longer applied to indistinguishable cases." Falcon, 162 So. 3d at 962. In Falcon, we found that applying a constitutional rule to some juvenile offenders but not to other similarly situated juvenile offenders simply because of the date their sentences became final would result in unjust disparate treatment of similarly situated persons. Id.; see also Thompson v. Dugger, 515 So. 2d 173 (Fla. 1987) (concluding that all death sentenced individuals, regardless of when their sentences became final, were entitled to seek relief in light of Hitchcock v. Dugger, 481 U.S. 393 (1987)). Accordingly, we concluded that "[t]he patent unfairness of depriving indistinguishable juvenile offenders of their liberty for the rest of their lives, based solely on when their cases were decided, weighs heavily in favor of [retroactivity]." Falcon, 162 So. 2d at 962.

Death penalty cases should be treated as a "class apart" from non-death penalty cases. Furman v. Georgia, 408 U.S. 238, 285-87 (1972). We have consistently noted that "death is different" and as such, required careful consideration by the judiciary. Robertson v. State, 143 So. 3d 907, 912 (Fla. 2014) (Florida jurisprudence "begins with the premise that death is different."); Yacob v. State, 136 So. 3d 539, 546 (Fla. 2014) ("[T]his Court's automatic, mandatory, and statutorily required review of death penalty cases 'must begin with the premise that

death is different.' "); Ocha v. State, 826 So. 2d 956, 964 (Fla. 2002) ("This Court has long adhered to the idea that [i]n the field of criminal law, there is no doubt that 'death is different.' "); Swafford v. State, 679 So. 2d 736, 740 (Fla. 1996) ("[O]ur jurisprudence also embraces the concept that 'death is different' and affords a correspondingly greater degree of scrutiny to capital proceedings."). In its decision today, this Court chooses not to minimize the risk of wholly arbitrary and capricious implantation of the death penalty.

In the present case, the majority strays from its reasoning in Falcon and decides that in capital cases where the Sixth Amendment rights of hundreds of persons were violated, it is appropriate to arbitrarily draw a line between June 23 and June 24, 2002—the day before and the day after Ring was decided. The majority does not offer a convincing rationale as to why 173 death sentenced persons should be treated differently than those whose sentences became final post-Ring, while overestimating the burden that these 173 capital cases will place on the judiciary. Because "death is different," retroactive application of Hurst v. Florida to all death sentenced persons cannot be justified by the mere fact that it will be harder to grant a new penalty phase or other relief to 173 additional persons.

One of the reasons given for this arbitrary line in the sand is the administration of justice.[38]  The majority opines that penalty phase proceedings are time intensive endeavors that require the State to present evidence from the guilt phase in addition to penalty-phase-specific evidence and that the jurors' ability to weigh the testimony of witnesses who may no longer be available will be impacted.  Indeed, the majority claims that the greater the time since the crime, the more difficult a new penalty phase will be.  Undoubtedly, there will be situations where persons who committed equally violent felonies and whose death sentences became final days apart will be treated differently without justification from this Court.  However, because death row defendants have succeeded in having convictions and sentences vacated for crimes that were committed long before Ring was decided and now have new sentences that became final after Ring was decided, the majority's conclusion is undermined and the application is arbitrary.

I submit that there is a more logical way to provide finality to the victims' families without violating the Eighth Amendment.  First, the majority has overstated the effect of retroactivity on the administration of justice: the effect would not be substantial.  The retroactive application of Hurst v. Florida would affect only capital cases.  Although they are generally more complex and require

---

38.  I agree with the majority that Witt is the appropriate test to determine retroactivity.

more judicial resources than other types of cases, capital cases make up only a small percentage (0.09 percent) of the 171,414 criminal cases filed in circuit court during the fiscal year 2014-15, and an even smaller percentage (0.02 percent) of the 753,011 total cases filed in circuit court. See Office of the State Courts Admin'r, Florida's Trial Courts Statistical Reference Guide: FY 2014-15, ch. 2, at 4 (2015), http://flcourts.org/core/fileparse.php/541/urlt/20150901-Chapter-2_Overall-Statistics_accessible.pdf. In light of this Court's mandatory jurisdiction over capital cases and the statutory requirement that capital cases be prosecuted in circuit court, the new rule would have no effect on either the district courts or county courts.

Moreover, because the majority opines that a new penalty phase is required in these cases, the burden on state attorneys, defense counsel, and the judiciary is not as great as if the convictions were vacated. However, even this burden could be eliminated if the Court were to abide by the Legislature's directive in section 775.082(2), Florida Statutes. In so doing, these capital defendants would receive life sentences, new penalty phase proceedings would be unnecessary, and the burden on the administration of justice would be nil. In other words, this Court has rejected an available remedy that creates no burden but then pronounces that the burden is far too great to provide equal application to similarly situated defendants. In short, there will be situations where persons who committed equally violent

felonies and whose death sentences became final days apart will be treated differently without justification from this Court.

For example, Asay committed two murders on the night of July 17, 1987. His sentence became final on October 7, 1991, when the United States Supreme Court denied certiorari. See Asay v. Florida, 502 U.S. 895 (1991). Asay's nine-to-three jury recommendation that resulted in a death sentence would not be constitutional if Hurst v. Florida applied to him, but the majority holds that he is not entitled to the Sixth Amendment protections articulated in Hurst v. Florida.[39] Yet, under the present majority's decision, another defendant who committed his offense on an earlier date but had his sentence vacated and was later resentenced

---

39. Furthermore, in today's decision, the Court declines to extend relief to Asay despite the fact that his nine-to-three jury recommendation violates our decision in Hurst v. State, which interpreted Hurst v. Florida and state law to require both unanimous jury findings and a unanimous jury verdict to impose the death penalty. See Hurst v. State, 202 So. 3d 40, 44 (Fla. 2016) ("In capital cases in Florida, these specific findings required to be made by the jury include the existence of each aggravating factor that has been proven beyond a reasonable doubt, the finding that the aggravating factors are sufficient, and the finding that the aggravating factors outweigh the mitigating circumstances. We also hold, based on Florida's requirement for unanimity in jury verdicts, and under the Eighth Amendment to the United States Constitution, that in order for the trial court to impose a sentence of death, the jury's recommended sentence of death must be unanimous."); see also id. at 57 ("[B]efore the trial judge may consider imposing a sentence of death, the jury in a capital case must unanimously and expressly find all the aggravating factors that were proven beyond a reasonable doubt, unanimously find that the aggravating factors are sufficient to impose a death, unanimously find that the aggravating factors outweigh the mitigating circumstances, and unanimously recommend a sentence of death.")

after <u>Ring</u>, cannot receive the death penalty without the protections articulated in

<u>Hurst</u>.[40]  Timothy Hurst committed his crimes on May 2, 1990, and was originally

sentenced on April 26, 2000, which was final October 21, 2002, a few short

months after the decision in <u>Ring</u>.[41]  The majority's application of <u>Hurst v. Florida</u>

makes constitutional protection depend on little more than a roll of the dice.  This

cannot be tolerated.

In light of the relatively few number of capital cases in proportion to the

judiciary's entire caseload and the fact that <u>Hurst v. Florida</u> requires either only

new penalty proceedings or no new proceedings at all, the administration of justice

would not be over-burdened by the retroactive application of <u>Hurst v. Florida</u>.  The

United States Supreme Court has previously applied new constitutional rules

retroactively despite significantly greater burdens on judicial administration.  For

instance, when the United States Supreme Court made retroactive its holding that

no juvenile may be sentenced to life in prison without some opportunity for

---

40.  <u>See, e.g.</u>, <u>Johnson v. State</u>, No. SC14-1175, 2016 WL 7013856, op. at 1 (Fla. Dec. 1, 2016) (Johnson was convicted for multiple murders occurring on January 8 and 9, 1981, and his sentences became final on February 21, 1984. Subsequently, this Court vacated Johnson's sentences and remanded for a new penalty phase.  This Court vacated Johnson's death sentence "[b]ecause the jury that recommended Johnson's death sentences did not find the facts necessary to sentence him to death . . . ."

41.  Hurst's sentence was later vacated in 2009.

release, it entitled some 2295 prisoners nationwide to resentencing proceedings or parole hearings. See Montgomery v. Alabama, 136 S. Ct. 718, 736 (2016); John R. Mills, et al., Juvenile Life Without Parole in Law and Practice: Chronicling the Rapid Change Underway, 65 Am. U. L. Rev. 535, 570 n.215 (2016). Following the United States Supreme Court's decision to require states to provide counsel to indigent defendants even in noncapital cases, this Court noted that the decision could require not just new sentencing proceedings but entirely new trials for 4542 prisoners, representing over half of Florida's entire prison population. Roy v. Wainwright, 151 So. 2d 825, 827 (Fla. 1963) ("The Division of Corrections reports that as of June 30, 1962, there were approximately 8,000 State prisoners in custody. Of this group 4,065 entered pleas of guilty without the benefit of counsel. Four hundred, seventy-seven (477) entered pleas of not guilty but were convicted without benefit of counsel."). The impact of Hurst v. Florida to the administration of justice pales in comparison.

Because I would find that Asay is entitled to the constitutional protections articulated in Hurst v. Florida, I turn now to what I would find to be the appropriate remedy. As I explained fully in Hurst v. State, 202 So. 3d 40, 75-76 (Fla. 2016), there is no compelling reason that the plain language of section 775.082(2), Florida Statutes, does not apply to this case. Because his death sentence is unconstitutional, Asay is entitled to the remedy that the Legislature has

specified: the sentencing court must vacate his death sentence and sentence him to life in prison. See § 775.082(2), Fla. Stat. (2015) ("In the event the death penalty in a capital felony is held to be unconstitutional by the Florida Supreme Court or the United States Supreme Court, the court having jurisdiction over a person previously sentenced to death for a capital felony shall cause such person to be brought before the court, and the court shall sentence such person to life imprisonment as provided in subsection (1).").

> The plain language of the statute does not rely on a specific amendment to the United States Constitution, nor does it refer to a specific decision by this Court or the United States Supreme Court. Further, it does not contemplate that all forms of the death penalty in all cases must be found unconstitutional. Instead, the statute uses singular articles to describe the circumstances by which the statute is to be triggered. Indeed, the statute repeatedly references a singular defendant being brought before a court for sentencing to life imprisonment.

Hurst v. State, 202 So. 3d at 75-76 (Perry, J., concurring in part and dissenting in part).

The sentencing court unconstitutionally imposed the death penalty on Asay. Accordingly, "the death penalty in [Asay's] capital felony [has been] held to be unconstitutional," and accordingly, "the court having jurisdiction over [Asay who was] previously sentenced to death for a capital felony shall cause [him] to be brought before the court, and the court shall sentence [him] to life imprisonment." Id. We need conduct no further legal gymnastics to carry out the will of the

Legislature. See, e.g., English v. State, 191 So. 3d 448, 450 (Fla. 2016) ("When the statutory language is clear or unambiguous, this Court need not look behind the statute's plain language or employ principles of statutory construction to determine legislative intent."). The sentencing court must impose a life sentence pursuant to section 775.082(2), Florida Statutes.

Three Cases:

An Appeal from the Circuit Court in and for Duval County,
    Tatiana Radi Salvador, Judge - Case No. 161987CF006876AXXXMA
And Original Proceedings – Habeas Corpus

Martin J. McClain and Linda McDermott of McClain & McDermott, P.A., Wilton Manors, Florida; and John Paul Abatecola, Estero, Florida,

    for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, and Charmaine Millsaps, Senior Assistant Attorney General, Tallahassee, Florida,

    for Appellee/Respondent

Billy Horatio Nolas, Chief, Capital Habeas Unit, Office of the Federal Public Defender, Northern District of Florida, Tallahassee, Florida,

    for Amicus Curiae The Capital Habeas Unit of the Office of the Federal
    Public Defender for the Northern District of Florida